EAST SHORE LAND COMPANY *vs.* FENNER H. PECKHAM, *et al.*

MARCH 18, 1912.

PRESENT: Dubois, C. J., Johnson, Parkhurst, and Sweetland, JJ.

(1)   *Constitutional Law.    Provisions Limited to Federal Government.*

Cons. U. S. Art. V. of amendments has no reference to State governments, but is restricted in its operation to the government of the United States.

*(2)*   *Constitutional Law.   Rights of Accused.*

Cons. R. I. Art. I, Sec. 10: ". . . nor shall *he* be deprived of life, liberty or property, unless by the judgment of his peers or the law of the land," relates to certain rights of the accused in criminal prosecutions.

*(3)*   *Constitutional Law.   Presumption of Constitutionality.*

All statutes being presumed to be constitutional, the burden of proving their unconstitutionality beyond a reasonable doubt is upon the one raising the question.

*(4)*   *Constitutional Law.   Eminent Domain.   Private Property Secured.   Metropolitan Park Act.*

Pub. Laws, cap. 569, approved April 27, 1910: "An Act to condemn certain land by the State for Metropolitan Park Purposes," provides that in case of the agreement of a party with the commission for the price or value of the land taken, *the same shall be paid to him forthwith,* upon the order of said commission, *by the general treasurer,* out of any funds available therefor, and in case of inability to so agree provision is made for the assessment of damages by a jury, with all rights of appeal, and upon the recovery of final judgment against said commission, execution shall be issued and shall be forthwith paid by the general treasurer out of any funds available therefor:—

*Held,* that the statute was not obnoxious to Cons. R. I. Art. I, Sec. 16: "private property shall not be taken for public use without just compensation," since its language constituted not only a direction to the State treasurer to forthwith pay the amounts ascertained to be due, out of any money in the treasury not otherwise appropriated, but amounted to an appropriation of such money for that purpose inasmuch as it subjected the same to that use.

Bill in Equity. Certified under Gen. Laws, 1909, cap. 298, § 1.

Dubois, C. J. In the above entitled cause, which is a suit in equity brought in the Superior Court, the constitutionality of Pub. Laws, cap. 569, approved April 27, 1910, has been brought in question upon the record by the complainant's amendment of the third paragraph in its bill of complaint wherein it is alleged: "that said chapter 569 of the Public Laws, passed at the January session, 1910, was and is in conflict with Article fifth of the articles in addition to and amendment of the constitution of the United States of America, which provides that 'No person shall be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation,' and is also in violation of Section 10 of

Article first of the Constitution of Rhode Island, which provides that 'No person shall be deprived of life, liberty or property unless by the judgment of his peers or the law of the land,' and is also in violation of Section 16 of Article first of the Constitution of Rhode Island, which provides that 'Private property shall not be taken for public use without just compensation.'" The constitutional questions aforesaid have been certified to this court for hearing and determination by the Superior Court under the provisions of Gen. Laws, 1909, cap. 298, § 1. The act in question is entitled "An act to condemn certain land by the State for metropolitan park purposes," and includes in the description of the lands that may be taken thereunder land belonging to the complainant.

The complainant alleges that the respondents undertook to take and condemn, under the provisions of said act, and in the manner therein prescribed, a certain portion of its said land, but that said taking and condemnation were ineffectual and void because of the unconstitutionality of said act hereinbefore alluded to. The portions of said act material to the present consideration read as follows: "Section 1. . . . and if any party shall agree with the executive committee of said commission for the price of the land so taken, or for the value of his right or interest therein, the same shall be paid to him forthwith, upon the order of said executive committee, by the general treasurer, out of any funds available therefor.

"Sec. 2. Any owner of, or any person entitled to any estate in, or interested in, any part of the land so taken, who cannot agree with the executive committee of said commission for the price of the land so taken, or of his right or interest therein, may, within three months after personal notice of said taking, or, if he have no personal notice, may within one year from the filing of the description and statement aforesaid, apply by petition to the superior court in the county of Providence, setting forth the taking of his land and praying for an assessment of damages by a jury. Upon the filing of such petition, said court shall cause twenty days'

notice of the pendency thereof to be given to said commission serving the secretary thereof with a certified copy thereof, and may proceed, after such notice, to the trial thereof, and such trial shall determine all questions of fact relating to the value of such land and the amount thereof, and such case and the verdict of the jury shall be subject to all rights of exception, of motions or petitions for new trial, and of appeal, as are now provided by law, and upon the recovery of final judgment, execution shall be issued therefor and shall be forthwith paid by the general treasurer out of any funds available therefor.

"Sec. 3. In case any owner or any person having an estate or interest in such land shall fail to receive personal notice of the taking of such land, and shall fail to file his petition, as provided in Section two hereof, said court, in its discretion, may permit the filing of such petition subsequent to said period of one year from the filing of such description and statement: *Provided*, such person shall have had no actual knowledge of the taking of such land in season to file such petition, and provided the state shall not have paid any other person or persons, claiming to own such land, the value thereof, or be liable to pay for the same under any judgment rendered against said commission under the provisions of this act.

"Sec. 4. The land authorized to be taken under this act shall be taken within one year after the passage hereof."

Although the complainant had attacked the constitutionality of the act upon three grounds, in the amended paragraph of its bill of complaint aforesaid, at the argument before this court it waived its claim that said act violated the provisions of the fifth amendment to the constitution of the United States.

The complainant lost nothing by its conduct in so doing, for this court has uniformly concurred in the doctrine announced by Chief Justice Marshall in the case of *Barron* v. *The Mayor and City Council of Baltimore*, 7 Pet. at p. 247: "The constitution was ordained and established by the

people of the United States for themselves, for their own government, and not for the government of the individual states. Each state established a constitution for itself, and in that constitution, provided such limitations and restrictions on the powers of its particular government, as its judgment dictated. The people of the United States framed such a government for the United States as they supposed best adapted to their situation and best calculated to promote their interests. The powers they conferred on this government were to be exercised by itself; and the limitations on power, if expressed in general terms are naturally, and, we think, necessarily, applicable to the government created by the instrument. They are limitations of power granted in the instrument itself; not of distinct governments, framed by different persons and for different purposes. If these propositions be correct, the fifth amendment must be understood as restraining the power of the general government, not as applicable to the states. In their several constitutions, they have imposed such restrictions on their respective governments as their own wisdom suggested; such as they deemed most proper for themselves. It is a subject on which they judge exclusively, and with which others interfere no further than they are supposed to have a common interest."

(1)    In *State* v. *Paul*, 5 R. I. at p. 196, Chief Justice Ames, referring to the fifth and sixth amendments to the Constitution of the United States, used the following language: "So far as this objection is claimed by virtue of the articles in amendment of the Constitution of the United States, it is certainly without foundation. From the history of these amendments, as well as from the necessary import of most of them, they have no reference to the state governments, but are restricted in their operation to the government of the United States. The states had already provided, or could provide, by their local constitution, for the preservation of the rights of trial against the action of their local authorities; and the articles in question originated in the well-known jealousy of

the power of the general government which so nearly prevented the adoption of the federal constitution," and added: "The lucid opinion of the late Chief Justice Marshall" (hereinbefore cited) "is an authority from the highest source upon this point, and fully·sustains the above position in regard to it."

(2)    Very likely the complainant may have intended to invoke the protection of that provision of Section 1 of the fourteenth amendment of the Constitution of the United States which reads as follows: "nor shall any state deprive any person of life, liberty or property, without due process of law."    The second violation complained of has reference to the constitution of Rhode Island, Art. I, sec. 10, which relates to certain rights of the accused and reads as follows:    "Sec. 10.    In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury; to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining them in his favor, to have the assistance of counsel in his defence, and shall be at liberty to speak for himself; nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land." It is to be noted that the language relied upon in the third paragraph of the complainant's bill of complaint as amended, viz., "no person shall be deprived of life, liberty or property unless by the judgment of his peers or the law of the land," differs from the words used in the section above quoted, which are: "nor shall he (the accused) be deprived of life, liberty or property," etc.    Concerning this section, in the case of *State* v. *Keeran*, 5 R. I., at p. 505, Chief Justice Ames *inter alia* made the following statements:    "Surely, if any clause in the constitution has a definite meaning, which should exclude all vagaries which would render courts the tyrants of the constitution, this clause, embodying, as it does, with improvements, the precious fruits of our English liberty, can claim to have, both from its history and long received interpretation.    It is no vague declaration concerning the

rights of property, which can be made to mean anything and everything; but an intensely practical, and somewhat minute provision, guarding the rights of persons *accused of crime*, at the various points at which they may be exposed, when pursued or on trial, to oppression from the state or its officials. The closing words of the clause, "*nisi per legale judicium parium suorum, vel per legem terrae*," as they stood in Magna Charta, by well-settled interpretation, were designed to secure all the rights of an English freeman whether peer or commoner, against royal power, by guaranteeing to him, when prosecuted at the king's suit, a trial by his equals, conducted according to the forms and by the process of the *English common law*—here, emphatically termed *the law of the land*." And again, on p. 506: "Now, one would suppose that the purport of this clause in our constitution was specific and practical enough to exclude all vague and remote inferences from it; and yet we are pressed by this inference from it, that the constitution, by thus particularly securing those criminally prosecuted from forfeiture of life, liberty, or property, without due process of law, must certainly have designed to inhibit the legislature from regulating the vendibility of property in the state, by prohibiting its sale in certain modes and for certain purposes, deemed to be injurious to the health, morals, and general well-being of the community," and further, on p. 507— "With us, it is the constitutional shield of *one accused of crime* against the sovereign many who are prosecuting him; and not a sword to cut down the power of the many, legislatively expressed, to declare what shall constitute a crime, when in future done by any or all. It guards the suspected and accused, the prisoner and captive, who need its protection; and has no application to the honored and free, whose rights of property are guarded by other clauses of the constitution, or by their rights and influence, as electors, under it." Ten years after the promulgation of the foregoing opinion in 1858, the fourteenth amendment of the Constitution of the United States was duly ratified and became a

portion of the fundamental law of the United States and also operated to restrain the several states from depriving persons of life, liberty or property without due process of law.   So that for more than forty years the rights of property of "the honored and free" have been guarded by more than their rights and influence as electors under the constitution of the State.   In the case of *Reynolds* v. *Randall*, 12 R. I. at p. 526, Chief Justice Durfee, considering the provisions of the Rhode Island Constitution, Art. I, Section 10, came to the conclusion that "grammatically the provision there seems to apply only in favor of persons accused of crime."   We have repeatedly so held.   See cases of *State* v. *Armeno*, 29 R. I., at p. 434, *State* v. *Rosenkrans*, 30 R. I., at p. 383; *State* v. *Hand Brewing Company*, 32 R. I., at p. 64. For the foregoing reasons the first and second constitutional questions attempted to be raised by the complainant need no further consideration.

(3)    The only remaining question is whether under the provisions of said Pub. Laws, cap. 569, the private property of the complainant has been taken, or is being taken, by the respondents for public use without just compensation, in violation of the constitution of Rhode Island, Art. I, sec. 16. All statutes are presumed to be valid and constitutional and the burden of proving the unconstitutionality of any statute is upon the party raising the question; furthermore, the rule is that he must prove it beyond a reasonable doubt.   *State* v. *Kofines*, 33 R. I., at p. 218, and cases there cited.

(1)    We had occasion to assemble some rules of statutory construction in the case of *Blais* v. *Franklin*, 31 R. I., 95, which are pertinent to the present consideration, *i. e.* "It has been well said that the object of all construction and interpretation of statutes is to ascertain the meaning and intention of the legislature, to the end that the same may be enforced.   This meaning and intention must be sought first of all in the language of the statute itself.   For it must be presumed that the means employed by the legislature to express its will are adequate to the purpose and do express that

will correctly. If the language of the statute is plain and free from ambiguity, and expresses a single, definite, and sensible meaning, that meaning is conclusively presumed to be the meaning which the legislature intended to convey. In other words, the statute must be interpreted literally. If the language of the statute is ambiguous, or lacks precision, or is fairly susceptible of two or more interpretations, the intended meaning of it must be sought by the aid of all pertinent and admissible considerations. But here, as before, the object of the search is the meaning and intention of the legislature, and the court is not at liberty, merely because it has a choice between two constructions, to substitute for the will of the legislature its own ideas as to the justice, expediency, or policy of the law. Black. Interp. Laws, Sections 24, 25, 26 and 27, and cases there cited.

(2) Every statute is to be construed with reference to its intended scope and the purpose of the legislature in enacting it; and where the language used is ambiguous, or admits of more than one meaning, it is to be taken in such sense as will conform to the scope of the act and carry out the purpose of the statute. *Ibid.* Section 30.

(3) Every statute is understood to contain, by implication, if not by its express terms, all such provisions as may be necessary to effectuate its object and purpose, or to make effective the rights, powers, privileges, or jurisdiction which it grants, and also all such collateral and subsidiary consequences as may be fairly and logically inferred from its terms. *Id.* Section 33 and cases cited. "Whenever powers, privileges, or property, are granted by a statute, everything indispensable to their enjoyment or exercise is impliedly granted also, as it would be in a grant between private persons." Endlich Interp. Stats. Section 418. 'All those minor directions and details which are not specified in the statute, but are involved in its general terms will be filled in, by implication, whenever it is necessary in order to give the law an effective operation. This is not adding to the act provisions which the legislature did not contemplate, but evolving from its broad terms those

particular provisions which are necessarily included within its general purpose and tenor.'  Black. Interp. Laws, p. 69.

(4)  Primarily a statute is to be interpreted according to the ordinary meaning of its words and the proper grammatical effect of their arrangement in the act.  But if there is any ambiguity, or if there is room for more than one interpretation, the rules of grammar will be disregarded where a too strict adherence to them would raise a repugnance or absurdity or would defeat the purpose of the legislature.  *Id.* Section 34 and cases cited.

(5)  The title of a statute can not control or vary the meaning of the enacting part, if the latter is plain and unambiguous.  But if there is doubt or obscurity in the body of the act, the title may be consulted, as a guide to the probable meaning of the legislature, and should be accorded some weight in the interpretation.  *Ibid.* Section 76 and cases cited."

The contention of the complainant is that the statute in question contains no sufficient provision for the payment to it of adequate compensation for the land taken and that under the provisions of the act there is no certainty of the compensation thereby ascertained ever being paid.  The complainant's argument is as follows:  "It is a fundamental principle that when the property of any citizen is taken under authority of the government against the will of such citizen, he shall be paid therefor a just compensation.  It is fundamental, in this state, differing from other states where the compensation must in all cases be paid in advance before entry, that the just compensation which is guaranteed by our constitution must either be paid before the title passes or must be secured to the owner of the property in some substantial manner, so that he will not be subjected to any uncertainty concerning it or any unreasonable delay in obtaining it.  Of course, where payment is made before the title passes, there can be no question of the validity of the act on the ground of lack of just compensation.  But where such payment is not made, the very serious question of what constitutes a securing of such compensation to the owner,

arises.  In the case of taking by *quasi-public* corporations under the authority of this state, it is invariably required that the corporation shall give such security for the payment of such compensation as the courts may order.  In the case of taking by the state for its own purposes, the law will require that such compensation as may be determined just by the courts, shall be secured by a definite appropriation for that purpose, provided for in the act under which the condemnation is made.  As was well said in the case of *Bloodgood* v. *Mohawk & Hudson Railroad Company*, 18 Wendell, 1, on page 17, where the opinion was written by Chancellor Walworth, 'I hold that before the legislature can authorize the agents of the state and others to enter upon and occupy or destroy or materially injure the private property of an individual, except in cases of actual necessity which will not admit any delay, an adequate and certain remedy must be provided whereby the owner of such property may compel the payment of damages or compensation, and that he is not bound to trust to the justice of the government to make provision for such compensation by future legislation. It was certainly not the intention of the framers of the constitution to authorize the property of a citizen to be taken and actually appropriated to the use of the public, and then to compel him to trust to the future justice of the legislature to provide him a compensation therefor.  The compensation must be either ascertained and paid to him before his property is thus appropriated or an appropriate remedy must be provided and upon an adequate fund, whereby he may obtain such compensation through the medium of the courts of justice, if those whose duty it is to make such compensation refuse to do so.  He has no such remedy, however, against the legislature to compel the passage of the necessary laws to ascertain the amount of compensation he is to receive or the fund out of which he is to be paid.'

"In *Haverhill Bridge* v. *County Commissioners*, 103 Mass., 124, the court said: 'The act granting the power must provide for the compensation and a ready means of ascertaining the amount.  Payment need not precede the seizure,

but the means of securing indemnity must be such that the owner will be put to no risk or unreasonable delay. If the statute . . . gives only the right of action against certain towns . . . with no process pointed out by which the right may be enforced without unreasonable delay, there would be force in the objection now urged against it on constitutional grounds.'

"In *Sage* v. *City of Brooklyn*, 89 N. Y., 189–198, it is said that 'Unless the statute imposes the primary or ultimate duty of paying for the land, it cannot be implied from the mere taking of the same for a park. The authority to take and the duty of the corporation to pay for the land taken depend upon positive law. The authority to take will be ineffectual unless accompanied with proper provisions for payment, but the duty of the corporation to pay the land-owner must be found in the affirmative prescriptions or reasonable intendments of the statute. It is sufficient if a certain and adequate remedy is provided by which the individual can obtain compensation without any unreasonable delay. Unless there is a certainty that it will be paid, or unless it is made a public charge, so that it may be obtained in due course through the aid of the courts without unreasonable delay, there is no adequate provision for obtaining compensation.'

"In *People* v. *Hayden*, 6 Hill, 359–361, Chief Justice Nelson said 'The settled doctrine, even as it respects the state itself, is that, at least, certain and ample provision must be first made by law (except in cases of public emergency), so that the owner can coerce payment through the judicial tribunals or otherwise, without any unreasonable or unnecessary delay.'

"In *Connecticut River Railroad* v. *County Commissioners*, 127 Mass. 50, it was held by Chief Justice Gray that the statute which provided that land taken for the Union Passenger Station should be paid for from the earnings of the *Troy & Greenfield Railroad and Hoosac Tunnel* (owned by the state) was unconstitutional, and the taking under that act

was void, for want of any provision for adequate and certain compensation to the owner; although it was admitted by the parties that the earnings of said railroad and tunnel would probably be sufficient to meet and extinguish all claims for damages for the lands so taken.   The court holding that such fact 'falls short of satisfying the requirement of the constitution that the owner of property taken for the use of the public shall have a prompt and certain compensation, without being subject to any risk or unreasonable delay.'

"In the section of the act which is under consideration, in the case at bar, no provision is made for 'adequate compensation.'   The language of the section is such that there is no certainty of the compensation ascertained ever being paid, and no means are provided by which a person, whose land is taken under the act, can secure his compensation by judicial process, nor is there any provision against unreasonable delay in his obtaining such compensation.   The mere provision that an execution shall issue upon a judgment is in itself of no value, as an execution cannot be enforced against the state.   A mere provision that, 'such execution shall be paid forthwith by the general treasurer out of any funds available therefor,' is of no value, as no funds available therefor have been provided by the act.   The general treasurer is authorized by law to pay out the State's funds only when the same are appropriated.

"See General Laws of Rhode Island, Chapter 43, Sections 4 and 10.   The latter of these sections is as follows:   'He shall pay from the state treasury money for the principal of and interest on the bonded debt, on the order of the state auditor, and for lawful orders on him of the governor or of the state auditor, and for no other purpose, but no money shall be paid therefrom, unless the same shall have been appropriated to the purposes for which it is to be paid.'

"And the custom and practice of the general assembly of this state is and has been, even in the case of resolutions, to provide for payment, either by directly appropriating a specific sum therefor, or, as in certain resolutions, 'the money

necessary to pay the expenses thereof is hereby appropriated out of any money in the treasury not otherwise appropriated.'

"The words 'out of any funds available therefor,' as used in this act, are certainly not words of common usage in the legislature of this state. They are certainly not the words which the General Assembly of this state has been accustomed to use in making appropriations. On the other hand, their use implies that the legislature had in mind that an appropriation would be necessary for the payment of the lands taken under the provisions of the act. But, as the act stands, there is no provision contained in it making an appropriation such as is required by law to be made in order that the general treasurer may lawfully pay out the funds of the state in his hands.

"If an execution or any other kind of an order should be presented to the general treasurer in pursuance of the provisions of this act, could he lawfully say that there were any funds in his possession available for the payment thereof? To what appropriation would he charge the payment if he made the same; he being required by Section seven of said Chapter forty-three of the General Laws to keep an account with each appropriation made?

"If, in accordance with this view, there is no appropriation for the payment of the lands taken under the act, there has certainly been no fulfillment of the requirements of the constitution as interpreted by the authorities hereinabove cited. For these reasons the complainant says that the act is unconstitutional and, therefore, void."

We see no reason for dissenting from the doctrine set forth in the cases cited in the foregoing argument; on the contrary, we heartily concur in the views therein expressed, but in our opinion they do not apply to the statute under consideration. It is undoubtedly true that statutes which authorize a taking must also provide for compensation. Lewis Em. Dom. § 452—"Statutes which provide for a condemnation of private property, and fail to provide compensation therefor,

have sometimes been spoken of as void. This is probably, however, a mere inadvertence of expression. Such acts would simply be inoperative so far as the power to condemn property is concerned, but might be carried into execution by the purchase of the requisite property, or aided by a subsequent act supplying the defect. Proceedings under such an act to take property *in invitum* will be quashed or set aside on motion, and any interference with property thereunder may be enjoined." However, a distinction is (4) recognized between a taking by the public and by private parties. *Ibid,* § 457: "As a general rule, the courts which hold that compensation need not precede occupation also hold that some provision must be made for compensation whereby the owner will *certainly* obtain it, and that it is not enough that the law provides a mode for ascertaining the amount of compensation and imposes, on the party taking, the duty of making payment. A distinction is usually made by such courts between a taking by the public, that is by the State or public corporations, and a taking by private corporations or individuals. In the former case, the compensation is a public charge, the good faith of the public is pledged for its payment, and all the resources of taxation may be employed in raising the amount."

"If the power of eminent domain is exercised for the benefit of the State or one of its municipalities, it is not essential that payment should first be provided, for it is supposed that the public faith is a sufficient pledge and guaranty for the payment of what is awarded. But in this case, the law must provide a means of making his claim effective against the State or the municipality, which shall be adequate and certain, and which may be initiated by the property owner himself at his own discretion." Black's Const. Law, second ed. p. 425, and cases cited.

' In the case of *Talbot et al.* v. *Hudson et als.,* 16 Gray, 417 (1860), a legislative act provided that a tract of overflowed land situated in different towns and owned by a large number of persons might be redeemed by the removal of the

dam by public officers and "compensation paid out of the treasury of the Commonwealth" to persons whose property was injured on a warrant drawn by the governor.

The constitutionality of the act was attacked on the ground that it contained "no reasonable, certain and adequate provision for compensation to those whose property may be taken and appropriated in carrying out the purposes of the act." The act was held constitutional in an able opinion by Bigelow, C. J., who said at p. 431: "By the third section of the act, it is provided that the damages which may be recovered on due proceedings had by the parties injured shall be paid out of the treasury of the Commonwealth, and the governor is authorized to draw his warrant therefor. This is clearly an appropriation of so much money as may be necessary to pay the damages which may be assessed under the act. The provision could not be more explicit or definite as to the amount appropriated. Until the damages are ascertained, and adjudicated, the sum which will be required to pay them is necessarily uncertain. There is no provision of law, which makes it requisite to the validity of an appropriation from the treasury of the Commonwealth that a specific sum should be named and set apart as a fund to meet a particular exigency. It is sufficient if by an act or resolve passed during the same or preceding political year the payment is authorized. St. 1858, C. I. Secs. 1, 2, Gen. Sts. C. 15, Secs. 30, 31. That such an appropriation affords a remedy sufficiently adequate and certain is too clear to admit of doubt. It is a pledge of the faith and credit of the Commonwealth, made in the most solemn and authentic manner, for the payment of the damages as soon as they are ascertained and liquidated by due process of law. Unless we can say that such a provision affords no reasonable guaranty that the persons injured will receive compensation we cannot adjudge the Statute to be unconstitutional. We certainly cannot assume that the Commonwealth will not fulfill its obligations. The presumption is directly the other way. Indeed the plaintiffs do not aver in their bill

that the damages which may be awarded to them under the act will not be duly paid. How then can it be said that no suitable and adequate provision is made in the act by which the plaintiffs can receive the compensation to which they may be entitled? The answer to the argument that no process is provided by which the payment can be secured and enforced is, that no such provision is necessary in cases where the power of eminent domain is exercised immediately by the State itself, in pursuance of a statute which enacts that compensation is to be made by a warrant drawn by the governor of the Commonwealth upon the public treasury. We are bound to presume that the chief magistrate of the State will perform his duty by drawing his warrant in conformity with the requirements of law, and that payment of a public debt thus treated will be duly made in like manner as all public dues and liabilities are paid out of the treasury of the State. The elementary principle that the sovereign can do no wrong is the foundation on which rests the rule recognized in our jurisprudence, by which the State is exempted from being subject to process at the suit of a creditor. The presumption of law is that the State will keep its faith inviolate and honestly fulfill all its obligations."

The provisions in the present act under consideration are that, in case of the agreement of a party with the executive committee of the commission for the price or value of the land or interest therein taken, *the same shall be paid to him forthwith,* upon the order of said executive committee, *by the general treasurer,* out of any funds available therefor. In case of inability to so agree ample provision is made for the assessment of damages by a jury, with every right preserved and upon the recovery of final judgment (against said commission as appears in sec. 3), execution shall be issued therefor and shall be forthwith paid by the general treasurer out of any funds available therefor. Section 3 permits the owner or person interested who fails to receive personal notice to file his petition within one year provided such person had no actual knowledge of the taking in time to file his petition,

and provided the state shall not have paid any other person, or be liable to pay for the same under any judgment rendered, under the provisions of the act. Can it be said that these provisions do not impose an obligation on the state? We think not. We cannot assume that the legislature intended to play fast and loose with the owners of the land described in the act, or that it was the intention to let the appropriations necessary to meet the expenses accruing thereunder be made the subject of future legislation. The language employed, while it may be unusual, is amply sufficient for the purpose. When the amount has been ascertained by agreement vouched for by an order, or by judgment verified by execution, the amount so established shall be forthwith paid by the general treasurer. If the act had stopped there the faith and credit of the state would have been sufficiently pledged without more. But the General Assembly saw fit to anticipate and reply to a question that might be asked by the general treasurer, viz., out of what fund? The answer given by the act is: "Out of any funds available therefor." It is manifest that money in the treasury otherwise appropriated would not be available for this purpose, and conversely, any money in the state treasury not otherwise appropriated would be available therefor. Accordingly we are of the opinion that the language employed in the act constitutes not only a direction to the state treasurer to forthwith pay the amount ascertained to be due, under the provisions of and in the manner required by the act, out of any money in the state treasury not otherwise appropriated, but also amounts to an appropriation of such money for that purpose, inasmuch as it subjects the same to that use. We are therefore of the opinion that the statute under consideration contains ample provisions for the prompt payment of just and adequate compensation, for land taken thereunder, to the persons entitled to the same, and find that the said act does not violate the requirements of the Constitution of Rhode Island, Art. I, sec. 16.

Having heard and determined the constitutional questions certified to us, the papers in the case with our decision certified thereon will be remitted to the Superior Court for further proceedings.

*Henry W. Hayes, Frank T. Easton,* for complainants.
*Harry P. Cross, Assistant Attorney General,* for respondents.