SHAWMUT BANK OF RHODE
ISLAND et al.

v.

Rickey L. COSTELLO.

No. 93–217–Appeal.

Supreme Court of Rhode Island.

June 15, 1994.

Philip Eiker, Providence, for plaintiff.

Albert Watt, Providence, for defendant.

## OPINION

MURRAY, Justice.

This matter came before this court on the appeal of the defendant, Rickey L. Costello (Costello), from a Superior Court order denying his motion to vacate or quash an ex parte writ of attachment. The writ of attachment was granted according to G.L.1956 (1985 Reenactment) § 10–5–5 to attach the personal property of Costello.

The facts that are pertinent to this action are as follows. On January 16, 1992, plaintiff Shawmut Bank of Rhode Island (Shawmut), foreclosed its mortgage with Costello on a residence located at 216–218 Sterling Avenue in Providence. At the time of the foreclosure proceedings Costello had defaulted on two promissory notes held by Shawmut and two notes held by Shawmut Mortgage Company. GTT Corporation (GTT), an affiliate of Shawmut, was the highest bidder for the property at the foreclosure sale. Subsequently GTT obtained a writ of eviction to eject Costello from the premises. On July 17, 1992, Constable Ronald J. Russo (Russo) and a Providence police officer arrived at the Sterling Avenue address to evict Costello.

Russo testified that upon entering Costello's third-floor apartment, he immediately noticed large quantities of gold coins, jewelry, and other so-called collectibles. Because Russo was concerned that some of the property might be contraband, he asked the police officer to contact another officer with more authority and the ability to determine whether the items were in fact contraband. Although a number of high-ranking Providence police officers arrived at the scene, they were unable to determine whether the items were contraband. After speaking with a representative from the Attorney General's office, Russo proceeded with the eviction process. Russo also testified that Costello arrived during the eviction process and attempted to "pocket [some] gold coins." Costello was subsequently ejected from the premises.

In order to safeguard the property and because it was a Friday, Russo obtained police surveillance of the premises for the weekend. Russo explained that he acquired police protection because once he had entered the apartment, he became personally responsible for its contents. Mercedes Lopez (Lopez), who shared the apartment with Costello and was his "business associate," arrived while Russo was segregating the articles. She asked whether she could remove property from the premises. Because Lopez was unable to produce evidence of ownership, she was not allowed to remove any property.

On July 21, 1992, the Superior Court granted, ex parte, Shawmut's application for a writ of attachment in the amount of $293,-515.16 relative to the assets in the apartment.

Russo testified that on July 24, 1992, he served Costello with the writ of attachment. Russo asserted that it took three to four days to remove the property from the premises because "90% of what we removed from the premises was in trash bags, on the floor, laying on the floor, piles, mounds, mixed in with dog feces, urine, [and] garbage." Russo stated that forty boxes of coins, jewelry, and wire, in addition to numerous other collectibles, were removed from the premises and stored at two secured locations in Pawtucket.

Russo also testified that he employed three appraisers to put a value on the property that had been removed from the apartment. He asserted that the face value of the coins was determined to be between $43,000 and $50,000. The other collectibles were not appraised.

On November 27, 1992, some four months after the writ of attachment had been issued, Costello filed a motion to vacate it. At the hearing the motion justice inquired whether Costello had standing to challenge the writ. In response Costello testified that he owned about $900's worth of the property seized, which he described as an "infinitesimal amount."[1] Costello testified that he owned miscellaneous "steel pennies, Buffalo nickels, Liberty nickels, Indian Head Pennies, and [some] foreign coins." Costello asserted that the remainder of the property seized belonged to Lopez.

The motion justice ruled that Costello's interest in the property seized was "insignificant" and determined that he did not have standing to challenge the writ of attachment. However, in anticipation of an appeal by Costello, the motion justice rendered his opinion regarding Costello's challenge to the issuance of the writ of attachment. The motion justice noted that Costello had attended a hearing in District Court in which GTT had obtained process to evict him. Additionally the motion justice noted that Costello had avoided service of process since April 1992. He also observed that Russo's discovery of the personal property put him in "jeopardy" and that Russo needed to act quickly to protect the property.

The motion justice stated that he issued the writ of attachment to preserve the property and to prevent its removal from the jurisdiction. Aware of a number of problems that Shawmut encountered with regard to Costello, he summarized the possible value of the attached property, noted the fact that Shawmut had foreclosed on four properties that Costello owned, and concluded that a large deficiency could result in the amount Costello owed Shawmut. Additionally the motion justice stated that Costello was given notice of the writ of attachment on July 24 but failed to challenge it until late November. He concluded that the writ of attachment was appropriately issued and found no "constitutional impairment." Subsequent to this finding he also granted Russo's application for compensation.

Costello avers that the trial justice erred by (1) denying his motions to vacate the writ of attachment and (2) granting Russo's application for compensation. Specifically, Costello contends that he has standing to challenge the writ of attachment and that § 10–5–5 is unconstitutional under the Fourteenth Amendment to the United States Constitution and under article 1, section 2, of the Constitution of the State of Rhode Island. Additionally Costello avers that the issuance of the writ was unconstitutional under both the Federal and State Constitutions. Furthermore Costello alleges that if § 10–5–5 is constitutional, the issuance of the writ violated the terms of the statute. Costello raises other arguments that we need not address because of our disposition of the aforementioned contentions.

 We now discuss the threshold issue of standing. "[T]he proper inquiry in resolving an issue of standing is whether the party seeking judicial review has suffered an 'injury in fact,' *either economic or otherwise,* as a result of the statute or action in dispute." (Emphasis added.) *In re Joseph,* 420 A.2d 85, 88 (R.I.1980); *see also Burns v. Sundlun,*

1. We believe that Costello misunderstood the definition of the word "infinitesimal." Costello testified that he comprehended the word to mean a "small fortune." This understanding does not coincide with the dictionary's definition "immeasurably or incalculably minute." The American Heritage Dictionary 659 (2d College ed.1982).

617 A.2d 114 (R.I.1992); *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 317 A.2d 124 (1974) (adopting the first prong of the test in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). It is important to note, particularly with regard to the facts before us, that the injury in fact alleged need not be substantial. *Matunuck Beach Hotel, Inc. v. Sheldon,* 121 R.I. 386, 395–96, 399 A.2d 489, 494 (1979). " 'The line is *not* between a *substantial* injury and an *insubstantial* injury. *The line is between injury and no injury.*' " (Emphasis added.) *Id.; see also United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254, 270–71, n. 14, (1973).

The motion justice determined that Costello lacked standing to challenge the writ of attachment, because, on the basis of the dollar amount of the writ issued, Costello claimed a "three one-thousandths" of a percent interest of its total value. The motion justice believed this amount "certainly * * * miniscule" and "insignificant" and concluded that Costello's interest did not bestow standing upon him to challenge the writ. However, relying upon our prior decisions, we believe this interest to be a sufficient economic interest to confer standing upon Costello. *See generally In re Joseph,* 420 A.2d 85 (R.I.1980); *Matunuck Beach Hotel, Inc. v. Sheldon,* 121 R.I. 386, 399 A.2d 489 (1979).

"As long as the person seeking judicial review has suffered an injury, he [or she] has the requisite personal stake in the outcome of the litigation to confer standing." *In re Joseph,* 420 A.2d at 89. Costello has alleged a "$900 injury." Consequently, based upon Costello's assertion that he owned some $900's worth of the seized property, our de-

termination is that he has standing to challenge the issuance of the writ of attachment.[2]

Costello next contends that § 10–5–5 is unconstitutional according to the Federal and the State Constitutions. Specifically, Costello argues that § 10–5–5 violates the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution.[3] Shawmut contends that § 10–5–5 provides for an opportunity to challenge the writ once property is seized and is therefore not violative of either the State or the Federal Constitution.

Section 10–5–5 provides:

"Writ of attachment after filing of equitable complaint.—In any civil action of an equitable character, at or after the filing of the complaint, the complainant may move the superior court, *ex parte,* to issue a writ of attachment, to run against the property of the defendants or any defendant in said cause; and the court, in its discretion, if the cause be of such a nature that an attachment of property be for the proper security of the complainant, *shall on such motion, properly supported by affidavits* to be filed in said cause, enter an order granting a writ of attachment, which writ may command the attachment of the real and personal estate of the defendant, including his [or her] personal estate in the hands or possession of any person, co-partnership or corporation, as the trustee of the defendant and his [or her] stock or shares in any banking association or other incorporated company, like a writ of attachment at the commencement of a civil action in conformity to the specific directions in said order; except as provided in § 6A–7–602, and shall be served in like manner and be subject to like incidents as a writ of attachment issued at the com-

---

**2.** We do wish to comment, however, that Costello's assertions of his ownership interest in the property were not substantiated by any evidence other than his testimony. Our uneasiness regarding Costello's assertions is supported by Shawmut's allegations that in a federal lawsuit Lopez claimed that she owned the property at the Sterling Avenue location. Additionally Shawmut asserts that Costello has a history of transferring assets to Lopez to avoid the claims of creditors.

**3.** The Fourteenth Amendment to the United States Constitution states in part that a "state [may not] deprive any person of life, liberty, or property, without due process of law * * *." Article 1, section 2, of the Rhode Island Constitution provides in part that "[n]o person shall be deprived of life, liberty or property without due process of law * * *."

mencement of a civil action, and for such ad damnum, as shall be directed in said order and stated in such writ. And all property so attached shall be held for the security of any final judgment which the complainant may obtain in his [or her] favor in said cause, in pursuance of the directions of the order granting such writ of attachment. If a writ of attachment runs against real property and title to such real property is held in the name of a partnership, the writ shall include the name of the partnership." (Emphasis added.)

■ Prejudgment-remedy statutes involve state action "substantial enough to implicate the Due Process Clause." *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 486, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565, 576 (1988). The United States Supreme Court has held that " '[p]arties whose rights are to be affected are entitled to be heard; and in order * * * [to exercise] that right they must first be notified.' " *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556, 569 (1972).

"[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. * * * No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him [or her] and an opportunity to meet it." *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170, 171–72, 71 S.Ct. 624, 647–48, 649, 95 L.Ed. 817, 853, 854 (1951) (Frankfurter, J., concurring).

The right to be notified and the opportunity to be heard must be granted " 'at a meaningful time and in a meaningful manner.' " *Fuentes*, 407 U.S. at 80, 92 S.Ct. at 1994, 32 L.Ed.2d at 570. To serve its full purpose, the notice of the hearing and the opportunity to be heard must be presented at a time when the deprivation can be obviated. *Id.* at 81, 92 S.Ct. at 1994, 32 L.Ed.2d at 570. However, the *Fuentes* Court did note that there are "extraordinary situations" that warrant delaying notice and the opportunity

for a hearing. *Id.* at 90, 92 S.Ct. at 1999, 32 L.Ed.2d at 575. The *Fuentes* Court described these extraordinary situations to include situations in which a valid government or general public interest is at stake, including a creditor's showing of immediate danger that a debtor will destroy or conceal goods. *Id.* at 90–93, 92 S.Ct. at 1999–2001, 32 L.Ed.2d at 575–77. However, *Fuentes* held that if a statute is to be interpreted as encompassing these extraordinary situations, it must be " '*narrowly drawn to meet any such unusual condition.*' " (Emphasis added.) *Id.* at 93, 92 S.Ct. at 2001, 32 L.Ed.2d at 577. The *Fuentes* Court held "that the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution required notice and a hearing prior to the issuance of a writ of replevin, *absent extraordinary circumstances.*" (Emphasis added.) *Martin v. Lincoln Bar, Inc.*, 622 A.2d 464, 466 (R.I.1993).

Subsequent to *Fuentes* the United States District Court for the District of Rhode Island held Rhode Island's attachment procedures unconstitutional because the attachment statute in effect at the time that *Fuentes* was decided allowed a plaintiff to obtain a prejudgment writ of attachment without furnishing a defendant with notice and an appropriate hearing. *McClellan v. Commercial Credit Corp.*, 350 F.Supp. 1013, 1014 (D.R.I.1972), *aff'd sub nom., Georges v. McClellan*, 409 U.S. 1120, 93 S.Ct. 935, 35 L.Ed.2d 253 (1973); *see also* G.L.1956 (1969 Reenactment) § 10–5–2. "It is patent that the pre-judgment attachment procedures employed in Rhode Island pursuant to Title 10, Chapter 5, R.I.G.L. are unconstitutional." *McClellan*, 350 F.Supp. at 1014.[4] Subsequent to *McClellan*, § 10–5–2 was amended to allow the defendant notice and the opportunity for a proper hearing. *See* P.L.1973, ch. 109, § 1.

Also as a result of *Fuentes* the Superior Court Rules of Civil Procedure governing attachment and trustee process were amended. *See* Super. R. Civ. P. 4, Reporter's Notes to 1972 Amendment (providing that the "thrust of [*Fuentes* ] is to place in *jeopar-*

---

4. Although not argued or briefed, we question whether the language of *McClellan* implicitly or sub silentio found G.L.1956 (1969 Reenactment) § 10–5–5 to be unconstitutional.

*dy any pre-judgment* interference with property interests without prior notice and hearing unless extraordinary circumstances are shown" (emphasis added)). In addition to amending Rule 4(j) of the Superior Court Rules of Civil Procedure, Rule 4(j)(3) was added, which although it preserved the practice of procuring writs of attachments in blank, also required that (1) the motion be submitted to the court, (2) the motion be granted only upon a showing that there is a probability of judgment in favor of the plaintiff, (3) there be a "need" for furnishing the plaintiff security, and (4) additional security at the discretion of the court may be imposed in connection with the issuance of the writ. *See* Super. R. Civ. P. 4(j)(3) and Reporter's Notes to the 1972 Amendment. The present rule explicitly provides that a motion granted under the rule *"shall not be granted ex parte."* (Emphasis added.) Super. R. Civ. P. 4(j)(3). Because the plaintiff must show a probability of a favorable judgment, proceeding under Rule 4(j) places a greater burden on the moving party than would a procedure under § 10–5–2. *Martin,* 622 A.2d at 467.

The Reporter's Notes also state that there may be instances when a court may issue a temporary restraining order to prevent the "disposition, concealment, destruction, or damage to the property which the plaintiff seeks to have attached, prior to the issuance of the attachment." Reporter's Notes to the 1972 Amendment. Therefore, the rule provides for appropriate relief in exigent circumstances. Additionally the notes enounce that the rules achieve the "merger of law and equity" in order to impose a balance between the plaintiff's need for security and the defendant's enjoyment of his or her property rights prior to any judgment's being enforced against him or her. *Id.*[5]

The *Fuentes* decision had an impact on both § 10–5–2 and the Superior Court Rules of Civil Procedure whereas, until this point,

§ 10–5–5 has purportedly escaped significant review or amendment. (*But see* inference suggested at note 4.) We have now been presented with an opportunity to review § 10–5–5.

■ In order to guide our constitutional analysis of § 10–5–5, we look to the three-part procedural due-process inquiry as set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). To determine what process is due under § 10–5–5, we must consider the private interest that will be affected by the prejudgment assessment, the risk of erroneous deprivation of the interest through the procedures in place and the probable value of additional safeguards, and the interest of the party seeking the prejudgment remedy including any governmental interest. *Id.* at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33; *see also United States v. James Daniel Good Real Property,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993); *Connecticut v. Doehr,* 501 U.S. 1, 9–10, 111 S.Ct. 2105, 115 L.Ed.2d 1, 13 (1991) (adjusting the third prong of the *Mathews'* test to include an analysis of a private party's interest in the remedy when a private party as opposed to the government is acting to effect a deprivation).

■ The private interest at stake here is that of personal property. The writ was issued in the amount of $293,515.16. We believe this to be a significant interest. *See generally Keystone Builders, Inc. v. Floor Fashions of Virginia, Inc.,* 829 F.Supp. 181, 183 (W.D.Va.1993) (finding prejudgment attachment of assets worth $75,177.78 a "serious concern to any defendant facing litigation"). In *Fuentes* the loss of kitchen appliances and household furniture was significant enough to require a predeprivation hearing. *Fuentes,* 407 U.S. at 70–71, 92 S.Ct. at 1989,

---

**5.** The history of § 10–5–2 and § 10–5–5 is rooted in the distinction between law and equity. Section 10–5–5 specifically applies to "any civil action of an equitable character * * *" whereas the pre–1973amendment language of § 10–5–2 applied to "civil actions." *See* G.L.1956 (1969 Reenactment) § 10–5–2; *see generally Martin v. Lincoln Bar, Inc.,* 622 A.2d 464, 466 (R.I.1993). Additionally a writ issued under § 10–5–5 "shall be served in like manner and be subject to like incidents as a writ of attachment issued at the commencement of a civil action * * *." With the merger of law and equity any distinction between § 10–5–2 and § 10–5–5 may seem meaningless. *See* Reporter's Notes to Super. R. Civ. P. 4 and Reporter's Notes to 1972 Amendment; *see generally Fitzgerald v. O'Connell,* 120 R.I. 240, 386 A.2d 1384 (1978).

32 L.Ed.2d at 564–65. This writ of attachment interferes with the rightful owner's use, possession, and enjoyment of the property and his or her right to sell it in his or her chosen occupation.

We deem it necessary to review two United States Supreme Court cases decided subsequent to *Fuentes* that aid in our discussion of the two remaining prongs of the *Mathews'* analysis and are dispositive of the issue we now address. We believe that the risk of erroneous deprivation permitted by § 10–5–5 is substantial. In *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the Court upheld a Louisiana statute allowing a seller with a vendor's lien to apply, ex parte, for a writ of sequestration without notice to or a prior hearing for the defendant. *Id.* at 602–03, 94 S.Ct. at 1897–98, 40 L.Ed.2d at 410–11. However, the circumstances in *Mitchell* are disparate from those now before this court. The creditor in *Mitchell* possessed a vendor's lien on the property. *Id.* at 602, 94 S.Ct. at 1897, 40 L.Ed.2d at 410. Additionally the statute provided that a criterion for the sequestration order was that the defendant could " 'conceal, dispose of, or waste the property * * *.' " *Id.* at 605, 94 S.Ct. at 1899, 40 L.Ed.2d at 412. Consequently the statute provided for instances of exigency. Furthermore in *Mitchell* a judge could authorize the issuance of the writ only after the creditor made a clear showing of the nature, the amount, and the grounds for the specific claim. *Id.* Although the statute allowed the hearing to be ex parte, it required that the creditor post a sufficient bond and allowed the debtor to seek immediate dissolution of the writ. *Id.* at 606, 94 S.Ct. at 1899, 40 L.Ed.2d at 412–13. The statute also provided for damages if the writ was improvidently issued. *Id.* at 617, 94 S.Ct. at 1905, 40 L.Ed.2d at 419.

In finding that the statute did not offend the United States Constitution, the Court held that the "statutory procedure effects a constitutional accommodation of the conflicting interests of the parties." *Id.* at 607, 94 S.Ct. at 1900, 40 L.Ed.2d at 413; *see also Keystone*, 829 F.Supp. at 183–85 (citing *Doehr* and concluding that the Virginia attachment statute was constitutional because Virginia allows prejudgment attachment only in *circumstances of exigency* and requires that (1) the plaintiff post a bond, (2) a judicial officer review the petition to ensure that reasonable grounds for the attachment exist, (3) the plaintiff "swear out" a petition specifying grounds for the attachment and the claim against the defendant, (4) the officer attaching the property issue a summons to the defendant accompanied by a form to request a hearing, and (5) the defendant be entitled to a hearing within ten days once given notice). Unlike the statute analyzed in *Mitchell,* we believe that § 10–5–5 does not accommodate the conflicting interests of the parties. The statute in *Mitchell* contained constitutional protections that § 10–5–5 does not.

More recently the Court struck down a Connecticut statute that allowed ex parte "prejudgment attachment of real estate without prior notice or hearing, without a showing of extraordinary circumstances, and without a requirement that the person seeking the attachment post a bond * * *." *Doehr,* 501 U.S. at 3, 111 S.Ct. at 2109, 115 L.Ed.2d at 9. In *Doehr* a plaintiff in an assault-and-battery action attached Doehr's home to ensure an availability of assets to satisfy a potential judgment. *Id.* at 4, 111 S.Ct. at 2109, 115 L.Ed.2d at 9. Despite the fact that the Connecticut statute provided for an expeditious postattachment hearing, notice of the postattachment hearing, judicial review of an adverse decision, and a double-damages penalty if the original suit was found to have been commenced without probable cause, the Court found the statute to be unconstitutional. *Id.* at 14–17, 111 S.Ct. at 2114–15, 115 L.Ed.2d at 16. The *Doehr* Court concluded that without a provision for exigent circumstances, a private party's interest in attaching the property did not validate the act of encumbering the property owner's rights without a hearing to adjudge the probability of recovery. *Id.* at 1749, 111 S.Ct. at 2116, 115 L.Ed.2d at 18. We are controlled by the reasoning of *Doehr.*

The facts of *Doehr* did not suggest that the debtor was about to take action that would render his real estate unavailable to satisfy a judgment. *Id.* at 15–17, 111 S.Ct. at 2115,

115 L.Ed.2d at 16. In fact *Doehr* clearly stated that "such a properly supported claim *would be an exigent circumstance permitting postponing any notice or hearing until after attachment is effected.*" (Emphasis added.) *Id.* at 15–17, 111 S.Ct. at 2115, 115 L.Ed.2d at 16–17; *see also Mitchell,* 416 U.S. at 609, 94 S.Ct. at 1901, 40 L.Ed.2d at 414. The *Doehr* Court went as far as admitting that disputes between debtors and creditors more freely lend themselves to "accurate *ex parte* assessments of the merits." *Doehr,* 501 U.S. at 15–17, 111 S.Ct. at 2115, 115 L.Ed.2d at 17. However, in spite of this deference to creditors, the Court held that a statute that failed to provide for a preattachment hearing without at least a prerequisite of some exigent circumstances clearly violates due process. *Id.* at 17–19, 111 S.Ct. at 2116, 115 L.Ed.2d at 18.

■ The second prong of the *Mathews'* analysis requires this court to analyze the risk of erroneous deprivation. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33. Not only does § 10–5–5 not provide for a preattachment hearing but more important for our analysis it is silent regarding a showing of any exigency to justify its ex parte proceedings. Section 10–5–5 is not narrowly drawn to meet the unusual conditions related to any exigent circumstances. *See Fuentes,* 407 U.S. at 93, 92 S.Ct. at 2001, 32 L.Ed.2d at 577. Additionally, among other deficiencies, it does not require plaintiff to post a bond. *See, e.g., Keystone,* 829 F.Supp. at 184.

The *Doehr* Court cited approvingly the language of *Pinsky v. Duncan,* 898 F.2d 852 (2d Cir.), *modified,* 907 F.2d 17 (2d Cir.1990), which held that

"[t]he rule to be derived from *Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) and its progeny, therefore, is not that postattachment hearings are generally acceptable provided that the plaintiff files a factual affidavit and that a judicial officer supervises the process, but that a prior hearing may be postponed where exceptional circumstances justify such a delay, *and where* sufficient additional safeguards are present." *Doehr,* 501 U.S. at 8, 111

S.Ct. at 2111, 115 L.Ed.2d at 11 (quoting *Pinsky,* 898 F.2d at 855).

Section 10–5–5 fails to provide adequate safeguards against the risk of erroneous deprivation. Section 10–5–5 provides less protection against erroneous deprivation than the protections noted and upheld in *Mitchell* and the minimal protections struck down in *Doehr.* Consequently the practice of an ex parte proceeding under § 10–5–5 poses an unacceptable peril of error.

Shawmut contends that § 10–5–5 does provide for a postdeprivation hearing by providing that its attachment procedures are "subject to like incidents as a writ of attachment issued at the commencement of a civil action." Shawmut argues that this language affords a defendant the right to a postattachment hearing. Even if we agreed with Shawmut's reading of the statute, § 10–5–5 would contain only one possible constitutional safeguard. We believe that providing for an immediate postdeprivation hearing alone would not save the statute. A plaintiff would still be able to obtain a writ of attachment at an ex parte hearing without a showing of exigent circumstances. "Moreover, the availability of a postseizure hearing [without a requirement for a preattachment showing of exigent circumstances or any other constitutional safeguards] may be no recompense for losses caused by erroneous seizure." *James Daniel Good Real Property,* —— U.S. at ——, 114 S.Ct. at 502, 126 L.Ed.2d at 505.

It is also compelling to indicate that at the time the Court decided *Doehr,* only three of the fifty states allowed for attachments without a prior hearing in occasions that did not involve any purportedly exigent circumstances. *Doehr,* 501 U.S. at 17–19, 111 S.Ct. at 2116, 115 L.Ed.2d at 18. As a result of *Doehr,* Connecticut's statute was struck down, leaving only Rhode Island and Washington to allow such attachments. *Id.* However, even Washington required the posting of a bond. *Id.* As a result it appears that the State of Rhode Island is the only state that allows for a prejudgment ex parte attachment based on a "skeletal affidavit," a one-sided hearing and nothing more. *See generally id.* at 14, 111 S.Ct. at 2114, 115 L.Ed.2d at 16.

Because we find § 10–5–5 so lacking in minimal constitutional protections and conclude that it thus presents too great a risk of erroneous deprivation, we need not closely analyze Shawmut's interest in the ex parte prejudgment attachment. By this summary disposition of the third prong of the *Mathews'* analysis, we in no way demean Shawmut's interest in the property or its assertion of exigent circumstances. However, because § 10–5–5 is void of the necessary language to ensure the essential constitutional safeguards, we need not further discuss Shawmut's interest. Moreover, any governmental fiscal or administrative burden that an additional procedural requirement would entail would be minimal. We note, however, that under a properly drafted statute providing for exigent circumstances, immediate seizure could be necessary to establish a court's jurisdiction over personal property and to protect it from being removed from that jurisdiction. *See generally James Daniel Good Real Property,* —— U.S. at ——, 114 S.Ct. at 502–03, 126 L.Ed.2d at 505; *see also Fuentes,* 407 U.S. at 93, 92 S.Ct. at 2000–01, 32 L.Ed.2d at 577.

Exceptional circumstances may postpone the necessity of a prior hearing; however, § 10–5–5 does not contain any provision for exigency, nor does it furnish any other significant safeguards to protect a defendant from bearing the brunt of the issuance of an ex parte writ of attachment. Accordingly "by failing to provide a preattachment hearing without at least requiring a showing of some exigent circumstance," § 10–5–5 "clearly falls short of the demands of due process" and violates the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution. *See Doehr,* 501 U.S. at 17–19, 111 S.Ct. at 2116, 115 L.Ed.2d at 18. Consequently the writ of attachment issued is invalid. Because of our disposition of this issue we need not reach Costello's remaining arguments regarding § 10–5–5.

▮ Last, Costello contends that it was a denial of his due-process rights to grant Russo compensation pursuant to G.L.1956 (1985 Reenactment) § 9–29–10 without affording him the opportunity to cross-examine "on the contents of [the] affidavits" submitted in support of the request for compensation and in support of proper service of the writ. Shawmut contends that the court properly granted Russo compensation according to § 9–29–10.

Section 9–29–10 provides that

"[t]he superior court or district courts, upon petition made by any sheriff or other officer setting forth the facts on oath, may allow such fair compensation for the keeping of personal property attached and held on mesne process as shall on examination be found to be reasonable."

We believe Costello's contention to be without merit. The record reflects that the trial justice properly granted compensation according to § 9–29–10. The statute reimburses the constable for *keeping* the attached property, not for serving the writ. Furthermore the record reflects that Costello adequately cross-examined Russo on the subject of the costs he incurred in safeguarding the property.

Because we believe that the circumstances of this case involve a certain measure of exigency, upon remand the Superior Court in its implicit equitable power may issue a writ of sequestration in order that Costello and other claimants can identify their rights of ownership in the property. *See Stubbs v. McGair,* 88 R.I. 272, 147 A.2d 469 (1959). Shawmut has a deficiency judgment against Costello, and the issuance of a sequestration order would be proper. *Id.* at 275, 147 A.2d at 471.

Consequently the defendant's appeal is sustained, and the judgment appealed from is vacated. The papers of this case are remanded to the Superior Court for a hearing consistent with our directions.