324 A.2d 641.

ADVISORY OPINION TO THE GOVERNOR.

AUGUST 6, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

Advisory Opinion to Governor relative to an act establishing a State Department of Economic Development, and an act relating to surplus Federal property and property reverting to the State of Rhode Island, otherwise known as Port Authority Act and Federal Lands Act, respectively.

August 6, 1974

To His Excellency Philip W. Noel
Governor of the State of Rhode Island
and Providence Plantations

Pursuant to amend. XII, sec. 2, of the state constitution, Your Excellency has requested our written opinion on seven specific questions which relate to two acts passed by the General Assembly at its January, 1974, session. The two acts are 74-H 7356, Substitute A, which is entitled "An Act Establishing a State Department of Economic Development," and 74-H 7788, Substitute A, which is entitled "An Act Relating to Surplus Federal Property and Property Reverting to the State of Rhode Island."

The first, 74-H 7356, Substitute A (hereinafter Port Authority Act) established, inter alia, the Rhode Island Port Authority and Economic Development Corporation (hereinafter Port Authority), which is a public corporation created to promote economic development within the state by acquiring and developing real and personal property. The second, 74-H 7788, Substitute A (hereinafter Federal Lands Act), (1) empowers the Port Authority "to

acquire and receive as agent of the State of Rhode Island" certain real and personal property which the federal government has or will declare surplus (hereinafter surplus lands) and dispose of under federal law, and (2) empowers the Governor, with the approval of the State Properties Committee, to transfer, grant, and convey to the Port Authority certain real property, which by virtue of P. L. 1939, chap. 696, has or will revert to the state (hereinafter reverter lands). Under sec. 3 of the Federal Lands Act, the Port Authority is authorized to use and dispose of the surplus and reverter lands in accordance with its corporate purposes.

Your Excellency informs us that the Port Authority, in the near future, will have taken all the required steps necessary to perfect its organization and soon thereafter plans to issue bonds and undertake the development of projects pursuant to its charter. In order to discharge Your Excellency's duties as Governor and to enable the Port Authority to become operative, issue bonds, and use and dispose of the surplus lands, reverter lands, and other properties, Your Excellency has requested our opinion on the following questions of law:

(1) Does the capital reserve fund deficiency provision contained in Section 18 of the Port Authority Act, under which the General Assembly in any given year may be asked to restore said fund to the minimum capital reserve fund requirement established for the fund, violate Article XXXI, Section 1, of Amendments to the Rhode Island Constitution in that a state debt is incurred, or a pledge of the faith of the state for the payment of the obligation of others is made, without the consent of the people?

(2) Do the purposes for which the General Assembly enacted the Port Authority Act constitute public purposes, and not local or private purposes, within the purview of Article IV, Section 14 of the State Constitution thereby permitting the General Assem-

bly to approve an appropriation bill submitted by the Governor pursuant to paragraph (d) of section 18 of said Act by a simple majority vote?

(3) Do the provisions of the Port Authority Act constitute a violation of Sections 2 and 10 of Article IV as an unlawful delegation of legislative authority and of Article III as a violation of the distribution of power provision of the State Constitution?

(4) Are the surplus lands described and designated in Section 1 of the Federal Lands Act "public property" within the purview of Article IV, Section 14 of the State Constitution?

(5) If the answer to question 4 is in the affirmative, does the Federal Lands Act constitute a bill appropriating such "public property" (i.e. the surplus lands and the reverter lands) within the purview of Article IV, Section 14 of the State Constitution?

(6) If the answers to questions 4 and 5 are both in the affirmative, can the Port Authority, after it has received title from the State to said surplus lands pursuant to the authority and directive set forth in the Federal Lands Act validly sell, convey, mortgage, pledge, lease, exchange, transfer and otherwise dispose of said surplus lands for such consideration and upon such terms and conditions as it shall determine without each such sale, conveyance, mortgage, pledge, lease, exchange, transfer or other disposition thereof having been assented to by two-thirds of the members elected to each House of the General Assembly as provided for in Article IV, Section 14 of the State Constitution?

(7) Can the Port Authority, upon acquisition of title to said reverter lands pursuant to the authority and directive set forth in the Federal Lands Act, validly sell, convey, mortgage, pledge, lease, exchange, transfer and otherwise dispose of said reverter lands for such consideration and upon such terms and conditions as it shall determine without each such sale, conveyance, mortgage, pledge, lease, exchange, transfer or other disposition thereof having been assented

to by two-thirds of the members elected to each House of the General Assembly as provided for in Article IV, Section 14 of the State Constitution?

## I.

Under sec. 18[1] the Port Authority is authorized to establish certain capital reserve funds. This section further provides that each capital reserve fund is required to have a minimum capital reserve. The first question concerns the constitutionality of the capital reserve fund deficiency provision, which is found in para. d of this section.

Section 18(d) provides as follows:

"In order further to assure the continued operation and solvency of the corporation for the carrying out of its corporate purposes, the executive director shall annually, on or before December 1st, make and deliver to the governor a certificate stating the sum, if any, required to restore each such capital reserve fund to the minimum capital reserve fund requirement for such fund. During each January session of the general assembly, the governor shall submit to the general assembly printed copies of a budget including the total of said sums, if any, as part of his budget required to restore each such capital reserve fund to the minimum capital reserve fund requirement for such fund. All sums appropriated by the general assembly for this purpose, and paid to the corporation, *if any*, shall be deposited by the corporation in the applicable capital reserve fund." (Emphasis added.)

The question asked is whether this provision violates amend. XXXI, sec. 1, of the state constitution, which provides:

"The general assembly shall have no powers, hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of in-

---

[1]General Laws 1956 (1969 Reenactment) §42-64-18.

surrection or invasion; nor shall they in any case, without such consent, pledge the faith of the state for the payment of the obligations of others. This section shall not be construed to refer to any money that may be deposited with this state by the government of the United States."

This question was considered in *Opinion to the Governor*, 112 R. I. 151, 308 A.2d 809 (1973). There we were asked whether the capital reserve deficiency fund provision of the Rhode Island Housing and Mortgage Finance Corporation Act[2] violated amend. XXXI, sec. 1. We advised that the capital reserve fund deficiency provision of that act did not constitute the incurrence of a debt or pledge of the state's credit because the General Assembly retained its right to concur or disagree with the Governor's budgetary recommendations. *Id.* at 157-58, 308 A.2d at 812.

The capital reserve fund deficiency provision found in sec. 18(d) of the Port Authority Act is virtually identical to the one we considered in *Opinion to the Governor*, 112 R. I. 151, 308 A.2d 809 (1973). There is nothing in this act which would cause us to change our opinion on the constitutionality of this provision. Accordingly, it is our opinion that sec. 18(d) does not violate amend. XXXI, sec. 1. We, therefore, answer this question in the negative.

## II.

Article IV, sec. 14, of the state constitution provides: "The assent of two-thirds of the members elected to each house of the general assembly shall be required to every bill appropriating the public money or property for local or private purposes." The second question is whether the purposes for which the Port Authority Act was promulgated are "public purposes" and not local or private in nature within the scope of art. IV, sec. 14, thereby permitting the General Assembly to approve an appropria-

---

[2]General Laws 1956 (1969 Reenactment) §42-55-14(4).

tion bill submitted by the Governor under sec. 18(d) by a simple majority vote. For the reasons hereinafter expressed, it is our opinion that the purposes set forth in this act are public.

In sec. 2[3] of the Port Authority Act, the General Assembly has made several findings to support the need for the enactment of this legislation. That section, in its most pertinent parts, reads:

"It is hereby found and declared that there exists in our state a condition of substantial and persistent unemployment and under employment which causes hardship to many individuals and families, * * * increases the public assistance burdens of the state, * * * impedes the economic and physical development of municipalities and adversely affects the welfare and prosperity of the state; that many existing industrial, manufacturing, recreational and commercial facilities in our state are obsolete and inefficient, and dilapidated; that many of these facilities are under utilized or in the process of being vacated, creating additional unemployment; * * * that the drastic curtailment of federal military installations in our state presently being undertaken * * * will further result in additional loss of employment * * *; that unaided efforts of private enterprises have not met and cannot meet the needs of providing such facilities * * *; that the economic insecurity attendant to such chronic and new unemployment and the absence of new employment opportunities constitutes a serious menace for the safety, morals and general welfare of the people of our state. * * * It is further found and declared that there exists in the state blighted or substandard areas, or areas which are becoming blighted and substandard, including obsolete and dilapidated buildings and structures, * * * all of which hamper or impede proper and economic growth of the area as well as the state as a whole."

---

[3]General Laws 1956 (1969 Reenactment) §42-64-2.

Section 2 continues on to declare that the purposes of this act are to "* * * retain existing industries and to induce, encourage and attract new industries through acquisition, construction, reconstruction and rehabilitation * * *" of industrial and recreational facilities, as well as all other aspects incident thereto. Prevention of economic stagnation and encouragement of the creation of new jobs are deemed paramount.

When considering the issue of the public purpose of the Port Authority Act, it is appropriate to note that the self-serving recitation of a public purpose within a legislative enactment is not conclusive of the existence of such a purpose. *People ex rel. City of Salem* v. *McMackin,* 53 Ill.2d 347, 354, 291 N.E.2d 807, 812 (1972). However, we stated in *Opinion to the Governor,* 112 R. I. 151, 308 A.2d 809 (1973), that while legislative findings in this area are subject to review, such a determination is entitled to great deference by the judiciary. *See also Berman* v. *Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *Narragansett Electric Lighting Co.* v. *Sabre,* 50 R. I. 288, 146 A. 777 (1929).

The considerations in establishing what is a public purpose are analogous to those that delineate the requisite "public use" that permits acquisition of private property by eminent domain. What we said about "public use" in *Romeo* v. *Cranston Redevelopment Agency,* 105 R. I. 651, 254 A.2d 426 (1969), is equally applicable to describe public purposes:

> "Today * * * it is our belief that a public use may not be given a rigid, unbending, absolute definition. In the everchanging conditions of our modern society, new advances in the fields of sciences, new concepts in the scope and function of government and other circumstances make it clear that the former concept as to what is a public use has undergone a great change. Views as to what constitutes a public use

necessarily vary with the changing conceptions of the scope and functions of government so that today there are familiar examples of such use which years ago would be unheard of. As governmental activities and services increased with the growing demands of society, the concept of 'public use' has broadened in proportion thereto. The modern trend of authority is to expand and liberally construe the meaning of 'public use.' " *Id.* at 658, 254 A.2d at 431.

The concept of public purpose is not a static one. It must be flexible and capable of expansion to meet conditions of a complex society that were not within the contemplation of the framers of our constitution.

An act of the General Assembly mandates judicial approval if, on any reasonable view, the act is designed to protect the public health, safety and welfare. *See State ex rel. Colvin v. Lombardi,* 104 R. I. 28, 241 A.2d 625 (1968). Furthermore, if the principal purpose and objective in a given enactment is public in nature, it does not matter that there will be an incidental benefit to private interests. *People ex rel. City of Salem v. McMackin, supra* at 355, 291 N.E.2d at 812-13; *Vermont Educational Buildings Financing Agency v. Mann,* 127 Vt. 262, 266, 247 A.2d 68, 71 (1968).

We recognize that what is for the public good and what are public purposes are, in the first instance, questions for the General Assembly to determine; that the General Assembly is vested with a large discretion; that its determinations are entitled to full consideration; and that the courts are not warranted in setting aside such an enactment unless it is clearly evasive of or contrary to constitutional prohibitions. *See State ex rel. Warren v. Nusbaum,* 59 Wis.2d 391, 208 N.W.2d 780 (1973). We find no clear evasion of a constitutional prohibition relative to the act meeting the public purpose standard.

Numerous courts[4] in approaching legislation of the type before us have approved their respective industrial-development acts and recognized that the consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. All of those courts acknowledge that the broadest expansion is perhaps reached in the areas of economic welfare, the precise problem with which the act before us is concerned. *See Harrison* v. *Claybrook*, 372 P.2d 602 (Okla. 1962).

We believe that the conditions of unemployment within the state are well known and need no documentation here. Legislation such as that under consideration here, intended to alleviate these conditions and their inherent problems, certainly is in the public interest. New and expanded industry in communities within Rhode Island provides work and opportunities not only for those who would be directly employed, but also for others who furnish goods and services to people who live and work in the economy. Clearly, "economic stagnation" would be precluded. The potential impetus to our economic development, which otherwise might be lost to other states, likewise serves the public interest.

Whether a public purpose is being served must be decided as each case arises and in light of the particular facts and circumstances of that case. We need only say here that the Port Authority Act confers direct public benefits of a general character for the promotion of the public welfare of the state. We, therefore, answer question number two in the affirmative.

---

[4]*See, e.g., Green* v. *City of Mt. Pleasant*, 256 Iowa 1184, 131 N.W.2d 5 (1964); *Uhls* v. *State ex rel. City of Cheyenne*, 429 P.2d 74 (Wyo. 1967); *Lerch* v. *Maryland Port Authority*, 240 Md. 438, 214 A.2d 761 (1965).

## III.

The third question relates to whether the enactment of the Port Authority Act constitutes an unlawful delegation of legislative authority in violation of art. III, and sec. 2 and sec. 10 of art. IV. It is well settled in this jurisdiction that the General Assembly may delegate legislative powers to an administrative agency provided the powers are transferred in expressly defined channels. *Opinion to the Governor,* 112 R. I. 151, 158, 308 A.2d 809, 812 (1973); *City of Warwick v. Warwick Regular Firemen's Ass'n,* 106 R. I. 109, 113, 256 A.2d 206, 209 (1969); *First Federal Savings and Loan Ass'n v. Langton,* 105 R. I. 236, 244, 251 A.2d 170, 175 (1969); *Opinion to the Governor,* 88 R. I. 202, 205, 145 A.2d 87, 89 (1958).

In our opinion, the powers delegated to the Port Authority are constitutionally permissible. The Port Authority's powers are specific and adequately delineated. This act specifically provides that the Port Authority is not empowered to undertake any project unless it makes certain findings enumerated in sec. 10.[5] Furthermore, the Port Authority's condemnation power is specified in sec. 9.[6] Whatever discretionary powers the Port Authority might have are specifically limited by legislative guidelines. *Opinion to the Governor,* 112 R. I. 151, 158, 308 A.2d 809, 813 (1973). We, therefore, answer question number three in the negative.

## IV.

The fourth, fifth, sixth, and seventh questions inquire whether under art. IV, sec. 14, of the constitution the Port Authority may sell, lease, exchange, transfer, or otherwise dispose of the surplus or reverter lands without the assent

---

[5] General Laws 1956 (1969 Reenactment) §42-64-10.

[6] General Laws 1956 (1969 Reenactment) §42-64-9.

of a two-thirds vote of the elected members of each House of the General Assembly. In the first place, art. IV, sec. 14, has application only where there is an appropriation of public property for local or private purposes and has no application to an appropriation of public property for public purposes. The question of whether a particular sale or other disposition of the surplus or reverter lands is or is not for a public purpose depends upon the facts and circumstances surrounding each transaction.

It is settled that, in giving advisory opinions under amend. XII, sec. 2, of the constitution, this court will not give opinions which require, directly or indirectly, an exercise of the factfinding power of the court. *Opinion to the Governor*, 96 R. I. 358, 191 A.2d 611 (1963). There we said that the constitutional requirement does not apply to inquiries that can be answered only through an exercise of the factfinding power, inasmuch as the justices of this court, in so doing, are acting as individuals and not exercising the judicial power of the state. We noted that the factfinding power inheres in the court as the judicial branch of state government and that it may not be exercised by justices when acting as individuals pursuant to the provisions of amend. XII, sec. 2.

We are of the opinion that we cannot answer questions 4, 5, 6, or 7 without exercising the factfinding power of the court, either by way of presuming the existence of certain facts or by conjecturing as to the terms and conditions that would be included in any of the conveyances referred to therein.

THOMAS H. ROBERTS

. THOMAS J. PAOLINO

ALFRED H. JOSLIN

THOMAS F. KELLEHER

JOHN F. DORIS