### RHODE ISLAND ECONOMIC DEVELOPMENT CORPORATION

v.

### THE PARKING COMPANY, L.P., et al.

No. 2004–357–Appeal.

Supreme Court of Rhode Island.

Feb. 23, 2006.

Samuel D. Zurier, Esq., Providence, for Plaintiff.

Deming E. Sherman, Esq., The Parking Co., L.P., Providence, for Defendant.

Stephen E. Snow, Esq., Fleet National Bank, Fleet Real Estate, Inc., for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and SUTTELL, JJ.

· OPINION

Justice GOLDBERG, for the Court.

In this case the Supreme Court is confronted with the difficult balance between the constitutional rights of a property owner and the inherent power of the state in a condemnation proceeding: Is a property owner entitled to a hearing on whether a taking by eminent domain is for a public use before the property may be condemned by the state? We have before us a contentious struggle for control of a multimillion-dollar parking facility, known as Garage B, at Theodore Francis Green Airport (airport). The respondent-appellants, The Parking Company, L.P., Fleet National Bank and Fleet Real Estate, Inc., appeal from an order of the Superior Court granting a so-called quick-take condemnation of a temporary easement in Garage B, based on an *ex parte* petition by the petitioner-appellee, the Rhode Island Economic Development Corporation.

The Superior Court ordered the condemnation in accordance with the quick-take provisions of G.L.1956 § 42–64–9. On appeal, the respondent-appellants raise several challenges to the constitutionality of § 42–64–9 and also question whether, in fact, the taking was for a public use. For the reasons set forth herein, we vacate the condemnation order of the Superior Court.

### Facts and Travel

The facts in this case are largely undisputed. In December 1986, the Rhode Island Department of Transportation (RIDOT), owner of the airport, entered into a concession and lease agreement (CLA) with Downing Airport Associates, L.P. (Downing). The CLA provided that Downing would build, on its adjacent land, a parking garage (Garage B), to service the airport, and, in return, Downing would be granted the exclusive right to operate Garage B and all other parking facilities at

the airport for a term of twenty years.[1] The CLA also provided that, upon its expiration, Downing would convey Garage B to RIDOT for no further consideration. Further, the CLA guaranteed RIDOT an option to purchase Garage B, before the CLA expired, in accordance with an agreed upon fee schedule.[2]

Several years after the agreement was made final, the parties to the CLA changed; RIDOT transferred management authority of the airport to the Rhode Island Airport Corporation (RIAC), a public corporation organized as a wholly owned subsidiary of the Rhode Island Economic Development Corporation (EDC),[3] and Downing eventually sold its interest to an entity that was renamed The Parking Company, L.P. (TPC). Consequently, RIAC and TPC became the parties in interest to the CLA and in the case before this Court.[4]

During the late 1990's the airport experienced a period of rapid growth and great prosperity. As a result, RIAC and TPC formed several new strategic agreements to capitalize on the expanding market. For instance, two new parking facilities were proposed for the land immediately adjacent to the airport and Garage B. One facility was to be constructed by RIAC and managed by TPC in accordance with the CLA (Garage A).[5] The other facility (Garage C) was to be constructed by a TPC affiliate, New England Parking Company, L.P. (NEP),[6] and independently managed. However, NEP agreed to pay RIAC 10 percent of the gross revenues from Garage C in return for access to and from the airport circulator road.

RIAC and TPC reached another strategic agreement that is important to this appeal. As valet parking at the airport increasingly grew in popularity, the parties mutually agreed to move this service from an hourly surface lot directly in front of the main terminal to a designated parking facility. This decision, embodied in the fourth amendment of the CLA (valet amendment), granted TPC, for the remainder of the CLA, the exclusive right to use

1. The twenty-year term was to begin upon the completion of Garage B and other improvements. Because all parties have argued before this Court that the CLA is set to expire in December of 2007, we proceed under the assumption that the basic term of the CLA commenced in December 1987.

2. RIDOT's option to purchase Garage B did not take effect until year eleven of the twenty year lease. In addition to the purchase price, RIDOT would also be responsible for any prepayment penalties or charges imposed by the mortgage holder, Fleet National Bank. The purchase price fee schedule was as follows:

| Year in Which Closing Occurs | Purchase Price |
| --- | --- |
| 11 | $6,306,100 |
| 12 | 5,850,800 |
| 13 | 5,347,900 |
| 14 | 4,792,300 |
| 15 | 4,178,500 |
| 16 | 3,500,400 |
| 17 | 2,751,300 * |
| 18 | 1,923,900 |
| 19 | 1,009,700 |
| 20 | -0- |

* Year in which taking occurred (2004).

3. See G.L.1956 chapter 2 of title 1, and § 42–64–7.1(a).

4. The respondent-appellant, Fleet National Bank, financed TPC's operation of Garage B and other parking-related improvements at the airport. As security for its loans to TPC, Fleet holds, among other things, a mortgage interest in Garage B.

5. The newly constructed parking facility, Garage A, was incorporated into the existing CLA by way of an amendment on April 21, 1998.

6. The distinction between TPC and NEP is not abundantly clear from the record. In papers filed with this Court, it appears that NEP, at times, freely negotiated on behalf of TPC on issues relative to the CLA; a contract to which NEP was not a party.

the first four levels of Garage B for express valet parking and, if the space was not needed for valet parking, the remaining two upper levels would accommodate overflow parking from RIAC's adjacent parking structure, Garage A.

Shortly after the valet amendment was ratified, the horrific September 11, 2001, terrorist attacks shocked the nation and its air-traveling citizenry. This national tragedy had a serious impact on the air travel industry, the effects of which still are felt today. In an effort to combat resultant financial deficits in the parking sector, TPC and NEP representatives attempted to negotiate the sale of Garage C to RIAC in exchange for a twenty-five year extension of the CLA. It was also communicated to RIAC that if an agreement was not reached, TPC/NEP would be forced to drop parking rates in Garage C to attract more business, thus, initiating a price war with similarly situated parking garages, such as Garage A. Ultimately, the negotiations proved unsuccessful.

Although unwilling to accept TPC and NEP's joint proposal, RIAC likewise was concerned about the decrease in airport parking revenues. In a letter dated October 3, 2003, RIAC informed TPC that it wanted to move valet parking out of Garage B or end it altogether so that Garage B could be used for daily parking, a move RIAC expected to produce a significant increase in parking revenues for both TPC and RIAC.[7] According to RIAC, the valet amendment was costing both parties sig-

nificant revenue, given the hundreds of valet parking spaces in Garage B that were underused on a daily basis.[8]

These negotiations also stalled, and the relationship of the parties began a steep descent and crash-landed. Ultimately, RIAC asked EDC, its parent, to condemn the valet amendment. On January 26, 2004, the EDC board (board) voted to condemn the valet amendment on behalf of RIAC. This vote was disclosed to TPC in a letter from EDC counsel on February 23, 2004. The letter also notified TPC that the board instructed counsel to negotiate a termination of the amendment in lieu of proceeding forward with the condemnation proceedings. In a sharply worded reply, TPC challenged EDC's authority "to condemn an amendment to a contract for concession services." Further, TPC questioned whether such an invocation of the state's eminent domain power would qualify as a public purpose under the Takings Clause.

Several months later, on June 28, 2004, EDC again addressed valet parking in Garage B. Rather than launch a condemnation of the valet amendment, the board voted to condemn, "a temporary easement in Garage B during the term of which [EDC] would have the exclusive use of the interior of Garage B, as well as all entrances and egresses therefrom, with the term of the temporary easement to begin as soon as practicable and last [through the remaining] Basic Term of the CLA * * *."[9]

7. In accordance with the third amendment to the CLA, RIAC was to receive the vast majority of parking revenues, that exceeded $2,870,000, generated from facilities governed by the CLA.

8. RIAC also communicated a willingness to begin preliminary discussions about exercising its option to purchase the remaining term of the CLA.

9. We note that this vote is different from the one taken on January 26, 2004 (as disclosed by EDC's counsel in his letter of February 23, 2004, to TPC), in that the EDC made no reference to condemning the valet amendment. Rather, the EDC indirectly recognized the existence and effect of the valet amendment by the following finding:
 "[A] conversion of Garage B to daily parking service would increase use of this facili-

On July 26, 2004, in accordance with the quick-take statute, the chairman of EDC issued a declaration that a temporary easement in Garage B, "which property is owned by the Parking Company, LP with mortgages held by Fleet National Bank and by Fleet Real Estate, Inc.," was taken pursuant to chapter 64 of title 42. The following day, EDC filed in the Warwick land evidence records, a copy of the chairman's statement and board resolution, in addition to a description of the condemned property. Thereafter, EDC proceeded to file in the Kent County Superior Court, an *ex parte* "Petition to Condemn Real Property Interest." The petition was accompanied by a memorandum and further documentation.[10] A justice of the Superior Court initially took up the petition in conference with EDC counsel, but it was set down for an *ex parte* hearing the next day.

At the hearing, again only counsel for EDC was present because TPC had not been informed of the proceeding. The hearing justice, clearly concerned about EDC's *ex parte* approach, asked counsel to outline the procedure that EDC followed in order to effectuate the condemnation. The hearing justice and counsel then discussed the issue of just compensation, the singular issue before the Superior Court. EDC counsel relied upon affidavits of real estate appraisers that valued TPC's leasehold easement in the property at $685,000. According to EDC this amount was reached by projecting revenues for the remaining three-and-a-half-year period that TPC would control Garage B. EDC counsel said further:

"Now, just for the record, this is not to own the garage. This is just instead to condemn the easement in the garage for three and a half years. The six hundred eighty-five thousand dollars is designed to compensate, in fact in our view overcompensate, The Parking Company."

Thereafter, the hearing justice, although noting that TPC could contest the amount of compensation ultimately approved by the Superior Court, inquired into any procedural safeguards concerning TPC's rights:

"THE COURT: * * * What procedure is available to the party whose interest is being condemned post-condemnation to challenge the appropriateness of the taking under the statute? I'm just curious how that takes place.

"EDC COUNSEL: Well, we didn't see anything specific in the statute, Judge. If I could * * *.

"THE COURT: I'm not sure there is anything specific in any condemnation statute. I'm just curious as a matter of judicial curiosity how that takes place.

"EDC COUNSEL: If I were [TPC] and I did not think that the statute was constitutional or that this was being applied outside of the statute's authority, I would be looking to contest that as part of this proceeding."

The trial justice, satisfied that the amount suggested by EDC was adequate compensation, entered counsel's proposed order. The order then was filed in the Warwick land evidence records. Notice of

---

ty, thereby serving the interests of the traveling public; *however, such a potential use is not currently possible without TPC's consent due to its current fee interest in Garage B and/or its anticipated leasehold interest therein as well as various agreements between the parties that are appurtenant to those real property interests which consent*

*TPC has refused to provide* [.]" (Emphasis added.)

**10.** The further documentation included: description of temporary easement, EDC resolution, statement of EDC chairman, property plat, affidavits, and proposed form of order.

the taking was provided to TPC, Fleet National Bank, and Fleet Real Estate, Inc., and TPC was dispossessed of all property rights in Garage B. Thereafter, TPC, Fleet National Bank, and Fleet Real Estate, Inc., appealed, averring that the condemnation statute was unconstitutional and that the taking was not for a public use.[11]

# I

## Jurisdiction

 In any case involving the power of eminent domain, there potentially are two central issues that confront us: (1) whether a taking is for public use; and (2) whether just compensation has been paid to the property owner. The EDC contends that this appeal is not properly before this Court because a final judgment has not been entered in the Superior Court and therefore the appeal is interlocutory. *See* G.L.1956 § 9–24–1. The issue of just compensation, pursuant to the appeal procedures set forth in the EDC condemnation statute, is not before us. However, we deem the issue of public use immediately appealable upon the Superior Court's approval of the condemnation.

We agree in the strict sense that a final judgment of just compensation has not been rendered in this case. However, the quick-take statute does not contemplate that the question of public use will be litigated in connection with the issue of just compensation; nor does the act provide for a post-condemnation proceeding to challenge whether the taking was for a public use. We are satisfied that the Superior Court's order of condemnation as drafted by EDC, contained sufficient elements of finality such that the issue of

public use is immediately appealable to this Court. In *McAuslan v. McAuslan,* 34 R.I. 462, 83 A. 837 (1912), we stated:

"Besides those provided for in the statute other instances may present themselves of decrees, in a strict sense interlocutory, which by reason of their possible injurious consequences require an immediate review and must be held for this reason to have such elements of finality as to permit an immediate appeal." *Id.* at 472, 83 A. at 841.

 The condemnation approval with which we are now confronted squarely falls within the ambit of *McAuslan* and does not necessitate further litigation in the Superior Court. TPC has been summarily dispossessed of its possessory rights to Garage B and deprived of its contractual rights under the CLA. The EDC prepared the flight plan in this case and elected to proceed on a solo voyage. The EDC barnstormed on an *ex parte* journey to Superior Court; it may not complain when the condemnee mobilizes its forces and navigates its appellate engine to this Court for review. The purpose of the final judgment rule is to prevent the piecemeal adjudication of disputes. *See Industrial National Bank of Providence v. Colt,* 101 R.I. 488, 491, 224 A.2d 900, 902 (1966) (commenting on recent amendments to the rules of practice in the context of the final judgment rule, Court concluded, "there has been no relaxing of the principle that litigants may not try their cases piecemeal"). That concern is not implicated in this case because TPC has been ejected from Garage B and has no adequate remedy. We deem the issue of public use to be dispositive. Moreover, if TPC's challenge to the public use component of the taking is placed in a holding pattern while it is forced to pursue

---

11. Related litigation was also undertaken in Superior Court: *The Parking Company, L.P. v. Rhode Island Airport Corp,* C.A. No. P.B.2004–4189 (R.I.Super.); *The Parking Co., L.P. v. Rhode Island Economic Development Corp.,* C.A. No. K.C.2004–905 (R.I.Super.).

just compensation, TPC stands to suffer injurious consequences consistent with our holding in *McAuslan*. Accordingly, we reject EDC's contention that this appeal is on the wrong flight path.

## II

## General Principles of the Law of Eminent Domain

### a. The Takings Clause

Simply stated, eminent domain is an exercise of the inherent power of the sovereign. The power of eminent domain refers to the right of the sovereign, or of those to whom the power has been delegated, to condemn private property for public use, and to appropriate the ownership and possession thereof for such use upon paying the owner a due compensation. 26 Am. Jur.2d *Eminent Domain* § 2 at 418 (2004). Eminent Domain is analogous, although more severe, to the power of the sovereign to regulate the use of land through zoning ordinances or the prohibition of nuisances. 29A C.J.S. *Eminent Domain* § 3 at 96 (1992).

■ Although a state's eminent domain authority is not derived from a specific constitutional grant, its exercise is limited by the Constitution. *City of Newport v. Newport Water Corp.*, 57 R.I. 269, 275, 189 A. 843, 846 (1937). In fact, both the United States Constitution and the Rhode Island Constitution place restrictions on its exercise. These constitutional boundaries are textually imbedded in the Takings Clause, which presupposes governmental power to take private property, but imposes two limitations on that authority: (1) private property may be taken only for public uses; and (2) the taking must be accompanied by just compensation. U.S. Const. Amend. V; R.I. Const. art. 1, sec. 16. The Rhode Island Supreme Court has referred to the Takings Clause

as "the safeguard in our state Constitution of property rights in condemnation proceedings." *Joslin Manufacturing Co. v. Clarke*, 41 R.I. 350, 357, 103 A. 935, 937 (1918).

■ It is well settled in this state that whether a taking constitutes a public use is a judicial question. *Opinion to the Governor*, 76 R.I. 249, 270, 69 A.2d 531, 541 (1949); *Newport Water Corp.*, 57 R.I. at 275, 189 A. at 846; *Narragansett Electric Lighting Co. v. Sabre*, 50 R.I. 288, 298, 146 A. 777, 782 (1929); *In re Rhode Island Suburban Railway Co.*, 22 R.I. 455, 456, 48 A. 590, 591 (1901). However, in contrast to establishing the nature of the use, the necessity and expediency of the taking to further the public use is purely a legislative question in which the courts do not engage. *Paiva v. Providence Redevelopment Agency*, 116 R.I. 315, 320, 356 A.2d 203, 206 (1976); *Golden Gate Corp. v. Sullivan*, 112 R.I. 641, 644, 314 A.2d 152, 154 (1974); *Opinion to the Governor*, 76 R.I. at 270, 69 A.2d at 541.

■ The just compensation prong of the Takings Clause also is reserved for the judiciary. *Newport Water Corp.*, 57 R.I. at 277, 189 A. at 847. Just compensation need not be paid before the taking as long as an adequate and certain remedy for payment is provided against the state or its agency. *Id.; see also Remington Realty Co. v. City of Providence*, 89 R.I. 102, 105–06, 151 A.2d 376, 378–79 (1959). Although a statutory formula that guarantees payment of just compensation is not essential, the Legislature must in some manner, make payment certain and definite and unequivocally provide a remedy for enforcement. *Remington Realty Co.*, 89 R.I. at 106, 151 A.2d at 379. It must "appear from the statute that funds are set aside, that payment therefrom is obligatory, and that a procedure is available to the

property owners for obtaining such payment." *Id.* Even though the issue of just compensation is not before us, the procedure followed in implementing that prong of the Takings Clause is relevant to our due process analysis.

### b. The Due Process Clause

■ The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides in pertinent part that: "[n]o person shall be * * * deprived of life, liberty, or property, without due process of law." Similarly, article 1, section 2, of the Rhode Island Constitution mandates that: "No person shall be deprived of life, liberty or property without due process of law[.]" These guarantees embrace both procedural and substantive due process. In discussing the dual aspect of due process, this Court has declared that the Due Process Clause not only ensures fair procedure, it also prohibits "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *L.A. Ray Realty v. Town Council of Cumberland,* 698 A.2d 202, 210 (R.I.1997). We further explained:

"Substantive due process, as opposed to procedural due process, addresses the 'essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible.'" *Id.* at 211 (quoting *Jolicoeur Furniture Co. v. Baldelli,* 653 A.2d 740, 751 (R.I.1995)).

■ Although the Takings Clause and the Due Process Clause act as checks on the power of eminent domain, they are distinctly different constitutional provisions that require separate analysis. In *Gem Plumbing Heating Co. v. Rossi,* 867 A.2d 796 (R.I.2005), this Court concluded

that the state's Mechanics' Lien Law did not violate procedural due process; in so holding we addressed this important distinction:

"We wish to clarify that the constitutional claim invoked here is one of procedural due process, which is manifestly different from a 'taking.' The former prevents the 'deprivation' of life, liberty, or property without due process. The latter provides protection from the government's power of eminent domain[.]" *Id.* at 801 n. 4.

This analytical distinction, however, does not mean that the two provisions operate exclusively of each other. A due process discussion is wholly appropriate in the context of a takings challenge, particularly when the property taken also was the subject of a contract between the parties.

This Court has discussed due process principles in the context of a takings challenge on numerous occasions. *See Joslin Manufacturing Co. v. Clarke,* 41 R.I. 350, 103 A. 935 (1918) (statute permitting condemnation for municipal water supply that authorized city to determine the necessity of the taking without a hearing does not violate Fourteenth Amendment due process guarantee because the determination of necessity is a legislative decision and not a judicial one); *M.S. Alper Son, Inc. v. Director of Public Works,* 98 R.I. 154, 200 A.2d 583 (1964) (state may not deny to the condemnee the right to a judicial or quasi-judicial determination of fair market value without violating the Due Process Clause of the Fourteenth Amendment to the United States Constitution); *Remington Realty Co. v. City of Providence,* 89 R.I. 102, 151 A.2d 376 (1959) (statute providing for off-street parking facilities in Providence was unconstitutional because it purported to employ power of eminent domain without appropriate statutory guarantee of payment of compensation); *East Shore*

*Land Co. v. Peckham,* 33 R.I. 541, 82 A. 487 (1912) (due process requires a reasonable guarantee that compensation will be paid).

In the seminal case of *Golden Gate Corp. v. Sullivan,* 112 R.I. 641, 314 A.2d 152 (1974), the boundaries of the Takings Clause and Due Process Clause clearly were defined. In *Golden Gate Corp.,* the plaintiff sought to enjoin the condemnation of 190 acres of his land and argued that the enabling statute was unconstitutional because it did not provide for a public hearing before the condemnation, as required by the Fourteenth Amendment. *Id.* at 643, 314 A.2d at 153. Conceding that there was no precedent requiring a pre-deprivation hearing in the context of an eminent domain proceeding, the plaintiff relied on the recently decided *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972),[12] to argue for a change in the law. The plaintiff contended that the *Fuentes* decision stood for the proposition that pre-deprivation hearings were constitutionally required and thus, Rhode Island precedent on the issue should be overruled. We rejected that argument and held:

"The right to a prior hearing attaches only to the deprivation of an interest encompassed within the [F]ourteenth [A]mendment. * * * However, the right to a hearing before the taking of private property by eminent domain is not a right encompassed within the [F]ourteenth [A]mendment." *Golden Gate Corp.,* 112 R.I. at 644, 314 A.2d at 154 (emphasis added).

This Court further explained that the Fourteenth Amendment did not require a hearing at all on the issues of necessity and expediency. *Id.*

Similarly, in *Paiva v. Providence Redevelopment Agency,* 116 R.I. 315, 356 A.2d 203 (1976), a property owner challenged the constitutionality of a redevelopment plan on the ground that he was deprived of actual notice of any public hearings conducted by the condemning authority before the taking. The plaintiff argued that the failure to provide him with notice of the hearings deprived him of his property without due process of law. Addressing only the issue of notice, the Court relied on our holding in *Golden Gate Corp.* and concluded:

"[I]n order for a constitutional claim like this one [the denial of due process] to succeed, one must show that he had been illegally deprived of a 'legally protected right.' This court has held that the right to a hearing attaches only to the deprivation of an interest encompassed within the [F]ourteenth [A]mendment and that the right to a hearing *prior* to the taking of property by eminent domain is not such a right." *Paiva,* 116 R.I. at 320, 356 A.2d at 206 (emphasis added) (citing *Golden Gate Corp.,* 112 R.I. at 644, 314 A.2d at 154).

As these cases demonstrate, this Court has consistently concluded that a pre-deprivation hearing is not required in an eminent domain proceeding.

Furthermore, we are of the opinion that procedural due process standards explicat-

---

**12.** *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), involved Florida and Pennsylvania prejudgment replevin statutes that authorized the summary seizure of goods or chattels in a person's possession. Both statutes provided for the issuance of a writ of replevin ordering state agents to seize a person's possessions upon the *ex parte* application of any other person who claimed a right to possession and posted a security bond. Neither statute provided for notice to the owner or a prior hearing to challenge the seizure. The Court held that these statutes violated the Fourteenth Amendment's guarantee that no state shall deprive any person of property without due process of law because they failed to provide for hearings at a meaningful time.

ed in creditors' rights cases are not germane to the exercise of eminent domain authority. The sovereign's power of eminent domain is distinctly different from the state's power to legislate in the area of mechanics' lien laws, replevin statutes, or other statutory remedial devices such as garnishment and attachment.[13]

 It is important to distinguish a creditor seeking possession of property pledged as security for a debt from the condemnation of property for the benefit of the public. The power of eminent domain is a sovereign right that does not rest on an underlying contractual relationship and is not subject to innumerable contractual challenges. Rather, it is a sovereign right that is limited in only two ways: (1) the condemnation must be for a public use; and (2) payment of just compensation.

Accordingly, these basic principles provide a general framework under which the trajectory of the EDC condemnation will be examined.

### III

### Constitutionality of the EDC Condemnation Statute

The Legislature created the EDC to "promote the economic development of the state and the general welfare of its citizens." Section 42–64–5(3). To aid in such objectives, the Legislature vested EDC with eminent domain authority to be exercised for any of the purposes for which EDC was created.

The condemnation statute at issue, 42–64–9, provides for a quick-take procedure that, as the characterization implies, affords the condemning authority the ability to effectuate a taking with rapidity. The condemning authority obtains title and may take possession of property merely by filing a declaration of condemnation and satisfying the court that its estimate of compensation is just. Notice to the landowner occurs after the taking is accomplished. Such a summary method of condemnation allows the government to take property for a public purpose without first litigating the question of just compensation or any other issues that may arise in a traditional eminent domain proceeding. 13 Powell on Real Property *Eminent Domain Procedures* 79F.06[1][b] at 73 (2000). This procedure is intended to avoid delay in a public project while the parties wrangle over these issues.

According to the quick-take statute, EDC first determines the necessity of the taking by a vote of its members. Section 42–64–9(d). Within six months of this vote, EDC must file in the appropriate municipal land evidence records, a copy of its vote together with a statement from the chairperson or vice chairperson that the property is taken pursuant to chapter 64 of title 42, and a description and plat of the property indicating the nature and extent of the interest taken. Section 42–64–9(d). The statute requires EDC to forthwith file copies of the same documents with the Superior Court, as well as a statement of the sum of money estimated to be just compensation. Section 42–64–9(e). The

---

13. In formulating its due process arguments, TPC relied on several creditors' rights cases: *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (attachment case); *North Georgia Finishing, Inc. v. Di–Chem Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) (garnishment case); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (replevin case); *Sniadach v. Family*

*Finance Corp. of Bay View,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (garnishment case); *Gem Plumbing Heating Co. v. Rossi,* 867 A.2d 796 (R.I.2005) (Mechanics' Lien Law case); *Shawmut Bank of Rhode Island v. Costello,* 643 A.2d 194 (R.I.1994) (attachment case). We are of the opinion that these cases are not material to the issues at bar.

EDC also must deposit with the court the estimated amount of just compensation. *Id.* After these filings are accomplished, EDC must satisfy the court that the amount deposited "is sufficient to satisfy the just claims of all persons having an estate or interest in the real property." *Id.*

The singular function of the Superior Court is to approve the appropriate amount of just compensation so that the claim of any interested person will be satisfied. Once the court approves the amount deposited in the registry, title to the property shall vest in EDC; and the "property shall be deemed to be condemned and taken for the use of the corporation and the right to just compensation for the condemned property shall vest in the persons entitled to compensation[.]" Section 42–64–9(f). Although no time frame is specified, the statute also requires EDC to serve notice of the taking upon the property owner after the copy of the vote, statement, description and plat are filed in the land evidence records. Section 42–64–9(g) and (j).

Although TPC does not challenge the delegation of condemnation power to the EDC, it alleges that 42–64–9 is unconstitutional because it impermissibly vests the EDC with the exclusive power to "deem" that a taking is for a public purpose. According to TPC, the statute violates the Takings Clause because it does not afford any procedure to challenge EDC's finding of a public use.

TPC also argues that the statute violates the Doctrine of Separation of Powers by usurping the role of the judiciary in ascertaining whether the taking is for a public use. Further, TPC alleges that a condemning authority's recitation of a public use is not conclusive and, although entitled to some judicial deference, bad faith on the part of the condemning authority or a demonstrably pretextual declaration of public use can defeat any presumption of public use that may arise. We shall address these issues seriatim.

### a. The Act's Use of Conclusory Language

█ TPC's primary challenge to the constitutionality of the quick-take statute centers on its contention that EDC is vested with the exclusive power to "deem" that a taking is for a public purpose. TPC alleges that this aspect of the statute renders it facially unconstitutional and creates an EDC "fiat" on the issue of public use by making its determination conclusive and unreviewable. We respectfully disagree.

█ In reviewing the statute "we are guided by the principle that legislative enactments enjoy a presumption of validity and constitutionality." *In re Advisory Opinion to House of Representatives (Casino II),* 885 A.2d 698, 702 (R.I.2005). "The act must stand as valid, unless we are convinced beyond a reasonable doubt, that it is contrary to a provision which is either expressly set forth in the State constitution or must, beyond a reasonable doubt, be necessarily implied from language expressly set forth therein." *In re Advisory Opinion to the Governor (Casino I),* 856 A.2d 320, 327 (R.I.2004) (quoting *In re Advisory Opinion to the House of Representatives,* 485 A.2d 550, 552 (R.I.1984)).

The condemnation statute provides in relevant part:

"If, for any of the purposes of this chapter, the corporation shall find it necessary to acquire any real property, whether for immediate or future use, the corporation may find and determine that the property, whether a fee simple absolute or a lesser interest, is required for the acquisition, construction, or operation of a project, and upon that determination, *the property shall be deemed to*

*be required for public use until otherwise determined by the corporation \* \* \*."* Section 42–64–9(a) (emphasis added).

This provision of the statute does not make EDC's determination that the property is required for public use conclusive or unreviewable; nor does it invade the judiciary's exclusive authority to answer the public use questions that may arise in a condemnation proceeding.

 Mindful that the question of whether property has been taken for a public use is reserved for the judiciary, this Court has addressed the issue of conclusory language in a statute that delegated eminent domain authority to a public agency. In *In re Rhode Island Suburban Railway Co.,* 22 R.I. 455, 48 A. 590 (1901), the Court was confronted with a condemnation statute that provided the taking could be for "corporate purposes" rather than "public purposes." In upholding its constitutionality, we held:

> "If a legislature should say that a certain taking was for a public use, that would not make it so; for such a rule would enable a legislature to conclude the question of constitutionality by its own declaration. The true rule is that the statute will be held to apply only to public purposes, unless it shows the contrary, and *the court will then determine whether the particular taking is for a public purpose." Id.* at 456, 48 A. at 591. (Emphasis added.)

As this passage indicates, a legislative declaration of public use is instructive, and entitled to deference, but not conclusive. This point was further amplified in *Opinion to the Governor,* in which the Court stated:

> "While the ultimate determination of the character of the use or purpose is a judicial and not a legislative question, yet where the legislature declares a par-

ticular use or purpose to be a 'public use' such a declaration must be given weight and will control unless the use or purpose in question is obviously of a private character." *Opinion to the Governor,* 76 R.I. at 258, 69 A.2d at 535 (citing *Narragansett Electric Lighting Co.,* 50 R.I. at 298, 146 A. at 782).

*See also In re Advisory Opinion to the Governor,* 113 R.I. 586, 593, 324 A.2d 641, 646 (1974) (When deciding if a condemnation comports with the Takings Clause, "the self-serving recitation of a public purpose within a legislative enactment is not conclusive" because the issue is reserved to the judiciary.).

Therefore, a legislative determination on the issue of public use, as with any enactment of the General Assembly, will be accorded deference by this Court, but is not dispositive. In light of the rebuttable nature of the legislative determination of public use, when a property owner challenges the public use aspect of a condemnation proceeding, judicial review is in order.

### b. Procedural Challenges

 Additionally, TPC argues that the condemnation statute is procedurally deficient because it fails to provide for a predeprivation hearing. We cannot agree with this contention. Specifically, TPC contends that the quick-take statute violates its right to procedural due process because judicial review of the question of public use is not specifically provided for in its provisions.

 Simply because the condemnation statute does not explicitly set forth a procedure to challenge the public use prong of the Takings Clause analysis, a landowner is not foreclosed from raising such objections in a judicial forum. Furthermore, TPC erroneously presumes that a Takings

Clause analysis is coextensive with that of a Due Process Clause analysis. As discussed, there is some overlap between these constitutional protections, but they require separate and distinct analyses. The Due Process Clause does not guarantee a property owner any particular form or method of state procedure. 27 Am. Jur.2d *Eminent Domain* 416 at 50–51 (2004). Rather, the procedural protections due a landowner in this situation are met if the condemnee is afforded an opportunity to challenge the public use aspect of the taking. *Id.* Such a remedy is available in this jurisdiction.

A landowner who believes that the state or other governmental body has no authority to initiate condemnation proceedings, or that the taking is not for a public use has two avenues of judicial review. First, as was the case here, the landowner may appeal from the Superior Court's order of condemnation. In the context of an *ex parte* condemnation proceeding, the absent condemnee may raise objections on appeal, which could have been raised during the condemnation hearing, but for his or her absence from court. For instance, whether the taking was for a public use is properly cognizable on appeal despite not being litigated in Superior Court because of the *ex parte* posture of that proceeding.[14] Alternatively, in a collateral proceeding, a property owner may seek declaratory or injunctive relief to restrain an eviction or test the validity of the condemnation. In either instance, the condemnation will be declared void and the landowner's eviction overturned if the taking does not meet the criteria for a legitimate public use.

We note that TPC has failed to point to any decisions by the United States Su-

preme Court or this Court suggesting that the Takings Clause requires a pre-deprivation hearing on the issue of public use. Although the United States Supreme Court has not expounded upon this exact issue, the Court summarily affirmed a lower federal court decision declaring that the issue of public use can be adequately addressed post-deprivation. *See Joiner v. City of Dallas*, 380 F.Supp. 754, 771–72 (N.D.Texas 1974); *aff'd*, 419 U.S. 1042, 95 S.Ct. 614, 42 L.Ed.2d 637 (1974). This Court's jurisprudence consistently has held that a post-deprivation hearing to contest a condemnation passes muster. *See Paiva*, 116 R.I. at 320–21, 356 A.2d at 206; *Golden Gate Corp.*, 112 R.I. at 644, 314 A.2d at 154. Thus, it is apparent to us that EDC's condemnation statute, while not explicitly setting forth a pre-deprivation hearing procedure on the issue of public use, does not run afoul of the Takings Clause. The taking in this case, however, and the turbulence it has engendered, leads us to a different runway.

## IV

### Public Use Determination

■ The EDC contends that the condemnation of a temporary easement in Garage B satisfies the public use requirement of the Takings Clause for three reasons: (1) the taking advanced the public purposes identified in the condemnation statute and thus was a public use; (2) a condemnation for airport parking is a public use; and (3) a taking resulting in state management of an airport parking facility qualifies as a public use. Further, according to EDC, any economic benefit derived from the taking was an incidental benefit and not its primary purpose. Despite

---

**14.** Although the record before this Court on appeal is limited, we need not remand this case for factual findings because the condemnee has supplied us with documentary proof to the extent necessary to address the issues raised on appeal; such is the risk that the sovereign faces in launching an *ex parte* flight.

these contentions, we are not persuaded that the condemnation of a so-called temporary easement in Garage B was an appropriate eminent domain maneuver or a fitting way to navigate the EDC condemnation statute. For the reasons that follow we are of the opinion that EDC failed to satisfy the public use requirement of the Takings Clause.

This Court has acknowledged that traditional notions of public use for real property that is taken from private citizens must yield to "the ever changing conditions of our modern society" such that "what constitutes a public use necessarily [varies] with the changing conceptions of the scope and functions of government * * *." *Romeo v. Cranston Redevelopment Agency*, 105 R.I. 651, 658, 254 A.2d 426, 431 (1969). In *Romeo*, we declared that the meaning of public use should be liberally construed at least with respect to redevelopment projects undertaken pursuant to legislative enactments in accordance with the state's redevelopment authority set forth in article 33[15] of the state constitution. *See Romeo*, 105 R.I. at 658, 254 A.2d at 431.

Further, "[w]hen the legislature's purpose is legitimate and its means are not irrational," the wisdom of the taking or the likelihood of success is not a subject for judicial debate. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 242–43, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). Thus, it is not for this Court to

question whether a taking authorized by the General Assembly will accomplish its intended goals because the constitution is satisfied if the Legislature *"rationally could have believed* that the [enactment] would promote its objective." *Id.* at 242, 104 S.Ct. 2321 (quoting *Western & Southern Life Insurance Co. v. State Board of Equalization of California*, 451 U.S. 648, 672, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981)). However, it is not the function of this Court to dissect a legislative declaration to glean a public purpose; nor will we engage in a syllogistic exercise in order to conclude that a particular taking was for a valid public purpose. Moreover, we have never retreated "in any degree from our previous declarations" on the public use prong of a Takings Clause analysis and continue to endorse "the well-established rule that what constitutes a public use is a judicial question[.]" *Romeo*, 105 R.I. at 664–65, 254 A.2d at 434.

This Court is mindful of the extreme grant of power that rests in an agency vested with eminent domain authority; and if confronted with a showing that the "agency has exceeded its delegated authority by an arbitrary, capricious or bad faith taking of private property," we unhesitatingly will declare it void. *Romeo*, 105 R.I. at 665, 254 A.2d at 434; *see also Capital Properties, Inc. v. State*, 749 A.2d 1069, 1086 (R.I.1999) ("[A] showing that a [state] agency has exceeded its delegated authority by an arbitrary, capricious or

---

**15.** Article 6, section 18, of the Rhode Island Constitution, formerly article 33, provides:

"**Redevelopment powers.**—The clearance, replanning, redevelopment, rehabilitation and improvement of blighted and substandard areas shall be a public use and purpose for which the power of eminent domain may be exercised, tax moneys and other public funds expended and public credit pledged. The general assembly may authorize cities, towns, or local redevelopment agencies to undertake and carry out projects approved by the local legislative body for such uses and purposes including the acquisition in such areas of such properties as the local legislative body may deem necessary or proper to effectuate any of the purposes of this article, although temporarily not required for such purposes, and the sale or other disposition of any such properties to private persons for private use or to public bodies for public uses."

bad faith taking of private property is a matter properly cognizable by the judicial branch."). Further, the substantive due process component of the Fourteenth Amendment Due Process Clause serves as the guardian of the "citizenry against arbitrary and capricious governmental action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate." *Brunelle v. Town of South Kingstown*, 700 A.2d 1075, 1084 (R.I.1997) (internal citations omitted).

The United States Supreme Court's recent holding in *Kelo v. City of New London*, —— U.S. ——, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), while upholding a taking for economic development purposes, stressed the condemning authority's responsibility of good faith and due diligence before it may start its condemnation engine. In determining whether an economic development project qualifies as a public use, under the Takings Clause, the Supreme Court focused on the City of New London's deliberative and methodical approach to formulating its economic development plan. The Court held:

> "Given the comprehensive character of the plan, the thorough deliberation that preceded its adoption, and the limited scope of our review, it is appropriate for us * * * to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan." *Id.* at 2665.

The City of New London's exhaustive preparatory efforts that preceded the takings in *Kelo*, stand in stark contrast to EDC's approach in the case before us.

 Although we accord deference to the findings of the condemning authority in a declaration of condemnation as well as the enabling statute upon which the taking rests, these findings are far from dispositive. *Advisory Opinion to the Gov-*

*ernor*, 113 R.I. at 593, 324 A.2d at 645–46. Whether a public purpose is being served must be decided on a case by case basis, "in light of the particular facts and circumstances of that case." *Id.* at 595, 324 A.2d at 647. The "principal purpose and objective in a given enactment [must be] public in nature," and is "designed to protect the public health, safety and welfare." *Id.* at 594, 324 A.2d 641, 324 A.2d at 656. If these conditions are met, then judicial approval is mandated, whether or not "there will be an incidental benefit to private interests." *Id.*

We have reviewed the condemnation of Garage B in the context of the Rhode Island Economic Development Corporation Act (chapter 64 of title 42) and the quick-take statute. For the reasons that follow, based on the record developed before us, we conclude that the principal purpose for the taking in this case was not a valid public use. We are satisfied that the condemnation of a temporary easement in Garage B was inappropriate, motivated by a desire for increased revenue and was not undertaken for a legitimate public purpose.

#### a. Option to Purchase

First and foremost, the parties in this case had a preexisting contractual relationship such that the CLA allocated the management and control of the parking lots owned by the parties to TPC. Included was an option to purchase provision, as set forth in Article XLIII of the CLA, that is relevant to this Court's analysis. This provision provided RIAC with the option to purchase Garage B, before the CLA expired, in accordance with an agreed upon fee schedule. Thus, instead of waiting until the end of the contract term, when title to Garage B was to transfer to RIAC for no further consideration, RIAC could acquire Garage B at an earlier date. After reviewing the record, it is clear to us

that by resorting to the quick-take statute, RIAC was able to gain control over Garage B before the CLA expired but without complying with this provision of the contract.

In July 2004, when the so-called temporary easement in Garage B was appropriated, (the seventeenth year of the CLA), the purchase price was $2,751,300. However, according to EDC, this option required a complicated adjustment, not addressed in the record, to which the parties could not agree. RIAC charted a different course—a purported condemnation of a temporary easement. The fact that RIAC clearly had the option to buyout TPC's remaining interest in the CLA, and elected not to do so because as it contends, the parties could not agree on the adjusted figures, belies the purported public purpose of the condemnation.

With the assistance of the EDC condemnation statute, RIAC gained possession and control of Garage B for an amount far less than what it agreed to pay in the CLA. After presenting "just compensation" evidence to a Superior Court justice, EDC and RIAC ousted TPC, to whom they owed a duty of good faith and fair dealing, and obtained all of the beneficial use of Garage B at a cost of $685,000. Unfortunately, EDC failed to disclose to the hearing justice that it already had an option to purchase Garage B for an amount far in excess of the compensation figure that EDC contended was just. Notwithstanding its appellate contention that the option to purchase was "a complex exercise" that was not exercised because "the parties could not agree on [the] fig-

ures," the payment schedule set forth in Article XLIII clearly was relevant in Superior Court on the issue of just compensation, and in this Court with respect to the question of public use.

The EDC also failed to alert the hearing justice that title to Garage B would vest in RIAC at the end of the contract term in 2007, for no additional consideration. The deployment of EDC's eminent domain authority in this instance resulted in a multi-million-dollar windfall to RIAC.[16]

To support its contention that the temporary easement was taken for a public use, EDC argues that any increase in revenues as a result of this taking was merely incidental to the primary public purpose for the condemnation: increased parking. However, no additional parking spaces were created; rather, those parking spaces previously dedicated to valet parking simply were reallocated for daily parking—a move EDC previously contended would result in a financial boon for both parties. Moreover, there was no finding that there was a shortage of parking spaces at RIAC's garages, or that the motoring public was unable to park at the airport or was inconvenienced in any way. There is no basis for the assertion that the public interest was better served by a loss of valet parking instead of self-parking. The EDC failed to make any findings that the taking would serve the public by increased parking or more accessible parking.

The EDC's conclusory declaration that a temporary easement in Garage B "will enable RIAC to promote a healthy and grow-

---

16. Although the issue of just compensation for Garage B is not before us in this appeal, it warrants mention here because, despite EDC's contentions to the contrary, the travel of this case discloses that RIAC and EDC's conduct was motivated by economic advantage in contravention of the EDC statute and

well-settled precedent on the issue of public use. *See Opinion to the Governor,* 76 R.I. 249, 69 A.2d 531 (1949) (upholding a community redevelopment act aimed at blighted property, but emphasizing that takings would not be approved based on mere economic advantage or aesthetic reasons).

ing economy, encourage the expansion of * * * commercial industry in Rhode Island" as well as assisting "in assuring that commercial, industrial and recreational activities in Rhode Island are served by appropriate transportation facilities" does not justify the taking in this case. There is no correlation between these worthwhile goals and the condemnation of a temporary easement in Garage B. Nor is there any indication, as set forth in the findings, how ousting TPC from Garage B, was necessary "to properly operate the [s]tate [a]irport." Thus, we are of the opinion that EDC's motivation in this case was to increase revenue and not create additional airport parking.

It is apparent to us that changes to the valet amendment in the CLA that RIAC could not achieve at the bargaining table were obtained in Superior Court through an exercise of the state's eminent domain authority. We need not look farther than EDC counsel's comments during the condemnation hearing for evidence of this fact. The hearing justice asked EDC's counsel, "what happens the next day once you have the [the garage]?" EDC counsel responded:

> "[We will] [a]sk [TPC] to vacate [the premises] so that the garage can be reconfigured so that it could be used more extensively. Now, at that point, if you will, the ball is in their court. *We would love if they negotiated with us at that point and all were resolved. We are happy to negotiate with them.* But if that does not happen, according to the statute it becomes EDC's right to occupy that garage and run it. That's what would happen." (Emphasis added).

In condemning TPC's property interest in Garage B, EDC altered the balance of bargaining power in its favor and was able to achieve in Superior Court the concessions it was unable to obtain from TPC.

We are satisfied that these circumstances do not establish a public purpose for the taking, but rather are similar to the arbitrary and bad-faith taking of private property that we condemned in *Capital Properties, Inc.*, 749 A.2d at 1087, upon a finding that the City of Providence exercised its condemnation authority in a bad faith and retaliatory manner after a drawn-out dispute with a downtown developer. *See also Union Station Associates v. Rossi*, 862 A.2d 185, 187 (R.I.2004) (In this companion case to *Capital Properties, Inc.*, Court noted, "at times the actions of the city during this saga could aptly be described as municipal thuggery."). Furthermore, such hasty maneuvering bears little resemblance to the comprehensive and thorough economic development plan that was undertaken and upheld by the United States Supreme Court in *Kelo v. City of New London*, —— U.S. ——, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005).

### b. Temporary Easement

The manner in which the power of eminent domain was exercised in this case the condemnation of a so-called temporary easement over an entire structure and the displacement of its owner, also gives us pause.

 As a practical matter, the condemnation of a temporary easement is a frequent occurrence; however, it is typically employed as a public works device. In general, a temporary easement is utilized in connection with land taken in fee simple for a public project when an additional piece of contiguous land is needed for temporary access or storage. *See Hickey v. Town of Burrillville*, 713 A.2d 781 (R.I. 1998) (town condemned a temporary easement in land for storage purposes); *Warwick Musical Theatre, Inc. v. State*, 525 A.2d 905 (R.I.1987) (state condemned a temporary easement in land for access

purposes). The utilization of a temporary easement for the purposes identified in this case does not satisfy this criteria and is a pretextual and inappropriate device.

■■■ First, an easement is defined as:

"An interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road). * * * Unlike a lease or license, an easement may last forever, *but it does not give the holder the right to possess, take from, improve, or sell the land.*" Black's Law Dictionary 548 (8th ed.2004) (emphasis added).

Contrary to this definition, this temporary easement vested EDC with exclusive possession of Garage B and required that TPC vacate the premises. In addition the temporary easement allowed EDC to obtain absolute control of a structure, as opposed to land, and to benefit from a profitable business at the expense of its rightful owner.

■■■ In its filing in the Warwick land evidence records, EDC described its newly acquired property interest as "an *exclusive* * * * right and easement to enter and use Parcel T1 [Garage B]." (Emphasis added.) The EDC's attempt to minimize the extent of its interest in the property, by arguing that it merely assumed control over the interior of Garage B, is disingenuous. Generally, an easement does not grant its holder the right to exclusive possession of the servient estate or the right to deprive the owner of his or her beneficial interest in the land that is the subject of the easement. The condemnation of a temporary easement in the context of TPC's loss of possession, control and the profits from Garage B was an inappropriate use of the state's eminent domain authority and not a public use. *See Capital Properties, Inc.,*

749 A.2d at 1087 (condemnation that amounts to an arbitrary, capricious or bad-faith taking of private property will be declared void).

■■ Additionally, although the easement was characterized as temporary, this temporal characterization is cause for concern. The temporary easement period in EDC's petition was scheduled to run from the date of the condemnation order until November 29, 2007, at 12 noon. In reality, there was nothing temporary about the property rights obtained by EDC and RIAC. The easement enabled RIAC to gain ownership and control of Garage B a full three and a half years before TPC's rights under the CLA were to expire. By providing that RIAC's easement would expire just days before the basic term of the CLA was scheduled to end, RIAC and EDC successfully avoided the bumpy issue of unity of title and merger of the easement with the fee. It is well established that unified ownership of the easement and the servient estate results in a merger of the easement with the fee, thereby extinguishing the easement as a matter of law. *See Newport Realty, Inc. v. Lynch,* 878 A.2d 1021, 1035 (R.I.2005) (easements are extinguished by merger when there is unity of title with the servient estate).

We are of the opinion that the taking in this case was not a proper exercise of the state's condemnation authority, but was designed to gain control of Garage B at a discounted price. Accordingly, we are satisfied that the taking was not for a public use in accordance with our Takings Clause jurisprudence and we declare it null and void.

### Conclusion

In conclusion, we hold that the EDC's quick-take condemnation statute, § 42–64–9, is constitutional on its face, but that the

manner in which it was applied in the case *sub judice* fails to pass constitutional scrutiny. The exercise of the state's power of eminent domain did not meet the legitimate public purposes identified in the EDC Act and was not a public use under the Takings Clause.

For the reasons stated herein, the judgment is vacated and the condemnation is declared void. We direct that Garage B shall be returned to the defendant, TPC, and that its contract rights shall be restored as of the date of the purported taking. The case is remanded to Superior Court for further proceedings consistent with this opinion.

Justice ROBINSON did not participate.