Janet Coit, in her capacity as Director of     :
   the Rhode Island Department of
    Environmental Management

                 v.                 :

   John H. Tillinghast et al.         :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Janet Coit, in her capacity as Director of :
    the Rhode Island Department of
      Environmental Management

              v.               :

John H. Tillinghast et al.[1]     :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Flaherty, for the Court.** Bowdish Lake Camping Area is located in the bucolic northwest corner of Rhode Island. Unfortunately, however, a long-simmering dispute between the parties in this case has been in marked contrast to the tranquil natural environment. The plaintiff, Janet Coit, named in her official capacity as director of the Rhode Island Department of Environmental Management (DEM), appeals from an order of the Superior Court in favor of the defendants, John, Alfred, and Anna Tillinghast adopting the report of a master and ordering that the master's findings be implemented.[2] The root of the dispute arises from the operation of the

---

[1] At the time the present action was filed in Superior Court, Timothy R.E. Keeney was the director of the Rhode Island Department of Environmental Management (DEM). The caption has been revised to reflect the current director pursuant to Rule 25(d) of the Superior Court Rules of Civil Procedure.

[2] In their opposition to the contempt motion in the Superior Court, defendants claimed that Alfred Tillinghast had passed away "several years" previously. The defendants also disclosed that John Tillinghast had not been a signatory to the "Consent Agreement" that is at issue in this case. Nonetheless, we shall continue to refer to the parties as "defendants" or "the Tillinghasts."

Bowdish Lake Camping Area in Glocester and Burrillville, and more specifically, from the establishment of five campsites located in Burrillville near Wilbur Pond. To assist in ameliorating the contentious relationship between the parties, a justice of the Superior Court appointed a master to resolve the issues in dispute, issues that stem from a consent agreement signed by the parties in 1998. This case came before the Supreme Court for oral argument on May 13, 2014, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we deny and dismiss the appeal because it is not properly before us.

**Facts and Travel**

According to defendants, in the early 1970s the Tillinghasts worked with the United States Soil Conservation Service to develop Bowdish Lake Camping Area. The facility, consisting of 400 campsites in Glocester and Burrillville, opened in 1973. From that point on, however, the sailing was less than smooth. In 1975, storm clouds first appeared after DEM issued the first of many notices of violations to defendants for alleged transgressions of G.L. 1956 § 2-1-21, a statute within the Freshwater Wetlands Act.[3] Over a twenty-five-year period, a

---

[3] General Laws 1956 § 2-1-21 says, in relevant part,

> "(a)(1) No person, firm, industry, company, corporation, city, town, municipal or state agency, fire district, club, nonprofit agency, or other individual or group may excavate; drain; fill; place trash, garbage, sewage, highway runoff, drainage ditch effluents, earth, rock, borrow, gravel, sand, clay, peat, or other materials or effluents upon; divert water flows into or out of; dike; dam; divert; change; add to or take from or otherwise alter the character of any fresh water wetland as defined in § 2-1-20 without

- 2 -

pattern developed whereby DEM would notify the Tillinghasts of alleged environmental violations, both formally and informally, defendants would respond with an explanation, and DEM would not take further action for several years.

On February 5, 1997, after defendants allegedly violated a DEM-issued cease-and-desist order by continuing to conduct dredging activity on the lake bed of Bowdish Lake, DEM filed the instant action in Superior Court. In their answer, defendants asserted that their actions were predicated on a written determination by DEM in 1974 that the dredging did not violate the Freshwater Wetlands Act. On March 25, in an apparent resolution of the conflict, the parties signed a consent agreement, in which the Tillinghasts agreed that they would "not undertake any future dredging activity in Bowdish Lake without prior application and written approval of [DEM]." Furthermore, the parties agreed that DEM's February 1974 permit "as it relate[d] to any and all dredging rights, [wa]s [t]hereby null and void." It is significant that the March 1997 consent order resolved only a handful of the many ongoing issues between the parties.

In an effort to resolve all the outstanding points of contention, some of which involved controversies that spanned two decades, the parties executed a second consent agreement on August 5, 1998.[4] That agreement addressed four specific alleged violations and outlined the actions the Tillinghasts would take to remedy them. One of those violations, which is the subject of this appeal, concerned the five campsites at Wilbur Pond. The defendants agreed that by June 1999, they would restore the vegetation that had been cleared within a fifty-foot zone of the pond, unless defendants applied for permission, and received approval, to have the campsites remain within the perimeter. The agreement acknowledged that defendants had developed the

_____

first obtaining the approval of the director of the department of environmental management."

[4] The 1998 consent agreement specified that the Superior Court would "retain[] jurisdiction to enforce the provisions of this [o]rder."

campsites "under what [they] believed was a valid permit issued before regulations were enacted."[5]

Unfortunately, the 1998 consent agreement did not achieve the harmony that it sought. In March 2000, DEM filed a motion to adjudge defendants in contempt for failing to implement certain aspects of the 1998 order. In May of that year, a justice of the Superior Court ordered defendants to restore the vegetation within fifty feet of Wilbur Pond, which was the location of the five campsites, or submit an application to DEM to alter the wetlands as had been agreed to in the 1998 agreement. In 2008, DEM filed a new motion to adjudge defendants in contempt for failure to comply with the 1998 consent agreement. Finally, in September 2009, the parties executed a new consent order in which they agreed to the appointment of Scott Rabideau as master to resolve "all issues relating to and contained in th[e] * * * [c]onsent [a]greement dated July 31, 1998 between the parties, and [o]rder of May 3, 2000."[6] In accordance with the parties' agreement, the court appointed the master and ordered him to "prepare a report and make recommendations to the [c]ourt," setting forth findings of fact and conclusions of law, if required. The master was further instructed to submit a draft report to both parties for comment before submitting a final report to the court.

---

[5] Although the General Assembly passed G.L. 1956 part 2 of chapter 1 of title 2, the Freshwater Wetlands Act, in 1971, the authority to promulgate regulations in accordance with the act was granted as part of a 1974 amendment. Compare P.L. 1971, ch. 213, § 1 (establishing "Fresh Water Wetlands" Act) with P.L. 1974, ch. 197, § 1 (amending "Fresh Water Wetlands" to include authority to promulgate rules and regulations).

[6] The 2009 consent order specifically listed the following as issues to be decided by the master:
> "All issues raised by Plaintiff in its Motion to Adjudge Defendant in Contempt; effect of the April 4, 1973 letter issued in application F-401, pertaining to clearing swamp and damming streams to create pond; beach maintenance and dredging issues including application 01-0089 as the same are still in dispute; together with any other issue this [c]ourt deems proper for resolution at this time."

The master submitted the draft report in January 2010. Not surprisingly, given the litigious history of this matter, DEM filed various objections. After the court heard arguments in February and March 2010, the trial justice ordered either the Tillinghasts, the master, or both, to restore the wetlands in the vicinity of the five campsites around Wilbur Pond and ordered that the campsites remain closed until the restoration was complete. The master was also required to submit his report and recommendation to DEM as an application to alter the wetlands around the campsites. DEM was to consider this application in accordance with its regulations and render a decision, which would be reviewed by the trial justice. The 2010 order further specified that the Superior Court would retain jurisdiction in this matter "at all times."

On June 10, 2010, the master filed an application with DEM, which included the same analysis and recommendations as the draft report. The application concluded that, because of the limited scope and location of the campsites, a minimum twenty-five-foot perimeter of wetland around Wilbur Pond, and the vegetative cover around and between the campsites, the five campsites did "not represent a random, unnecessary, or undesirable disturbance to state jurisdictional freshwater wetlands." After conducting its review, DEM denied the application on August, 30, 2011. DEM concluded that the five campsites were undesirable and against the public interest, and noted that the application did not demonstrate how adverse environmental impacts would be "avoided to the maximum extent possible."

The defendants then filed a motion asking that the trial justice approve the master's report, and the court heard argument relating to the appropriate burden of proof. The defendants argued that, according to Rule 53(e)(2) of the Superior Court Rules of Civil Procedure, in nonjury actions, the trial justice "shall accept the master's findings of fact unless clearly

erroneous."[7] DEM retorted that the master's submission was not the type of report that resides within the scope of Rule 53 because it was not prepared and filed with the court, but with DEM, and therefore, it "should be reviewed in accordance with the standards of [DEM's] regulations and with the [s]tate's Freshwater Wetlands Act[.]" However, the trial justice ruled that the master's application to DEM would be considered as the proposed final report and that DEM would be saddled with the burden to prove that the master's findings of fact were clearly erroneous.

On August 30 and 31, 2012, the court conducted an evidentiary hearing with respect to the master's application. Martin Wencek, a supervisor of DEM's freshwater wetlands program, testified that he reviewed the master's application and that he, along with other senior staff, made the decision to deny it. Wencek said that he had concluded that the five campsites would "result in loss of wildlife habitat and disturbance to wildlife," which "would change the character of the existing wetland." Wencek also testified that the application lacked a substantive exploration of alternatives that would avoid any impact on the wetlands as required under 12-190-028 R.I. Code R. 10.02D.(1) of DEM's rules and regulations governing the administration and enforcement of the Freshwater Wetlands Act.[8]

_____

[7] Rule 53(e)(1) of the Superior Court Rules of Civil Procedure says, "The master shall prepare a report upon the matters submitted to the master by the order of reference and, if required to make findings of fact and conclusions of law, the master shall set them forth in the report."

[8] 12-190-028 R.I. Code R. 10.02D.(1), entitled "Application to Alter Freshwater Wetland," includes the following:

> "Avoidance: All persons must satisfactorily demonstrate to the [d]epartment in the form of a written narrative that all probable impacts to freshwater wetlands functions and values have been avoided to the maximum extent possible. The written narrative must describe what steps were taken to avoid impacts to freshwater wetlands."

The rule continues to list six minimum areas that the applicant must consider and address.

- 6 -

Rabideau, the master, testified that the 2010 consent agreement directed him to oversee the restoration of the five campsites and to submit an application to DEM to alter the freshwater wetlands. Rabideau indicated that DEM had availed itself of the opportunity to inspect the restoration and that DEM had determined that the wetlands around the five campsites had been restored to its satisfaction. He also claimed that he had addressed all portions of Rule 10.02D.(1), but he had not included an alternative-location analysis for the campsites because the 2010 agreement instructed him to file an application to alter the freshwater wetlands for the specific perimeter where the five campsites were located.

On March 20, 2013 the trial justice issued a bench decision on defendants' motion that he accept the report of the master. The trial justice concluded that the master's report and accompanying plans constituted findings of fact that would be upheld unless they were shown to be clearly erroneous, in accordance with Rule 53(e)(2). He asserted that he believed that this case, distilled to its essence, amounted to a difference of opinion between the master and DEM. He then noted that such a difference, in the context of an administrative appeal, would normally be resolved in favor of the agency. However, the trial justice reasoned that because this was not an administrative appeal, DEM bore the burden of proving that the master's findings were clearly erroneous, noting that the parties had agreed to the appointment of the master to resolve all issues between them. The trial justice held that because DEM had failed to satisfy its burden, he would adopt the master's report, and he ordered that the master's findings be implemented. The order memorializing the trial justice's ruling was filed on April 10, 2013. DEM filed a timely appeal to this Court.[9]

---

[9] We note that, generally, appellate review of denials by administrative agencies are heard pursuant to G.L. 1956 § 42-35-15 under the Administrative Procedures Act (APA). The 2010

The parties came before a single justice of this Court pursuant to Article I, Rule 12A(3) of the Supreme Court Rules of Appellate Procedure on February 10, 2014. As a result of that conference, the parties were directed to file supplemental memoranda to specifically address the issue of whether the "[o]rder of April 10, 2013 was interlocutory, and thus not appealable." Before this Court, DEM argues that the order is appealable because the master decided to address each of the four issues between the parties in turn by publishing separate reports pertaining to each. DEM also argued that, even if the order were determined to be interlocutory, the Court should decide the appeal nonetheless because the "five-campsite" issue has sufficient finality and because the 2013 order creates imminent and irreparable harm that may impact other orders in the case. We disagree. For the reasons outlined below, we conclude that the April 2013 order is interlocutory and therefore not properly before us.

## Discussion

We must first address whether this appeal is properly before the Court at this time. The Tillinghasts maintain that it is not; they argue that the appeal is interlocutory because the April 2013 order is not a final judgment, but merely the first action by the master to address the remaining issues between the parties. DEM concedes, both in its written submissions and at oral argument, that there are three outstanding issues pending in Superior Court that the parties agreed the master would resolve. However, DEM contends that Rabideau's decision to handle each of the four issues separately resulted in a final resolution after a hearing on the merits on the campsites issue and that, consequently, the April 2013 order should not be considered interlocutory.

---

order said that the Superior Court retained jurisdiction at all times; however, the retention of jurisdiction would not have precluded the trial justice from deciding the case under the APA.

We have held that "[i]nterlocutory orders are those that are provisional or temporary, or that decide some intermediate point or matter but are not a final decision of the whole matter." Simpson v. Vose, 702 A.2d 1176, 1177 (R.I. 1997) (mem.). "Generally, interlocutory orders are not subject to review unless the order or decree falls within one of the exceptions set forth in G.L. 1956 § 9-24-7 * * * ."[10] Cayer v. Cox Rhode Island Telecom, LLC, 85 A.3d 1140, 1146 (R.I. 2014) (quoting Chiaradio v. Falck, 794 A.2d 494, 496 (R.I. 2002)). Moreover, there is a second type of exception that is "judicial in origin." Boranian v. Richer, 983 A.2d 834, 837 (R.I. 2009). This familiar exception says that "an order may fall within the ambit of our judicially created rule that permits review of an interlocutory order that has such an element of finality as to require immediate review by this Court to avoid possible injurious consequences." Chiaradio, 794 A.2d at 496 (citing McAuslan v. McAuslan, 34 R.I. 462, 472, 83 A. 837, 841 (1912)). In those situations, we will review interlocutory orders "before the case is finally terminated in order to prevent clearly imminent and irreparable harm." Town of Lincoln v. Cournoyer, 118 R.I. 644, 648, 375 A.2d 410, 412-13 (1977). In Ross v. Mencoff, 82 R.I. 461, 465, 111 A.2d 356, 358 (1955), the complainant appealed the denial of a contempt motion for failure to produce records to a temporary receiver whom the trial justice appointed. We held that because the case required further proceedings and did not meet any of the above-mentioned exceptions, the appeal was not properly before the Court. Id. at 465, 111 A.2d at 358.

---

[10] General Laws 1956 § 9-24-7 provides as follows:

> "Whenever, upon a hearing in the [S]uperior [C]ourt, an injunction shall be granted or continued, or a receiver appointed, or a sale of real or personal property ordered, by an interlocutory order or judgment, or a new trial is ordered or denied after a trial by jury, an appeal may be taken from such order or judgment to the [S]upreme [C]ourt in like manner as from a final judgment, and the appeal shall take precedence in the [S]upreme [C]ourt."

After a thorough review of the record, we reach a similar conclusion here. The order that DEM appealed is not final; it is merely an order confirming the master's report and does not set forth the ultimate resolution of the parties' disputes. It is significant that this report is the first action undertaken by the master with respect to the four issues that the parties agreed that he would resolve. We find no precedent, and none is provided by DEM, to support the proposition that because the master decided to address each of these complicated points separately, the case has somehow become "bifurcated" into separate and distinct cases to such a degree that would render the adoption of his report on the first issue to be the equivalent of a final judgment. In our opinion, the 2013 order does not possess a sufficient element of finality to be appealable and is thus interlocutory.

In the alternative, DEM invites this Court to invoke the holding of McAuslan because the 2013 order raises the specter of imminent and irreparable harm, and as a result, it should be reviewed now. DEM argues that the master's decision with respect to the five campsites has an impact on other environmental issues in the case, and it urges that without this Court's review, DEM will not be able to effectively protect Rhode Island's natural resources at the Bowdish Lake Camping Area. However, DEM offers no explanation of what grave harm might come from the recognition of five campsites that have been in place for nearly four decades. We can discern no imminent and irreparable harm from the master's approval of the five campsites because the trees and other vegetation at issue were cleared long ago. In our opinion, there is simply no need to hear this appeal now, and to do so when there are remaining issues between these profusely litigious parties would encourage the sort of piecemeal adjudication of disputes that the final-judgment rule is designed to avoid. See Rhode Island Economic Development Corp. v. The Parking Co., L.P., 892 A.2d 87, 95 (R.I. 2006).

- 10 -

**Conclusion**

For the foregoing reasons, the appeal of the interlocutory order confirming the master's report is denied and dismissed. The papers are remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    Janet Coit, in her capacity as Director of the Rhode Island Department of Environmental Management v. John H. Tillinghast et al.

**CASE NO:**    No. 2013-197-Appeal.
(PC 97-592)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    June 9, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Marisa A. Desautel, Esq.

For Defendants:  Nicholas Gorham, Esq.